**Byron J. PHEGLEY and Fern Phegley, Plaintiffs-Appellants,**

v.

**PORTER–DeWITT CONSTRUCTION COMPANY, INC., Defendant-Respondent.**

No. 9176.

Missouri Court of Appeals, Springfield District.

Oct. 25, 1973.

---

1. *Cf.* The statutory private way of necessity. §§ 228.340 to 228.480, RSMo 1969, V.A.M.S.

Marvin L. Dinger, Ironton, for plaintiffs-appellants.

John Schneider, Samuel Richeson, Dearing, Richeson, Roberts & Wegmann, Hillsboro, for defendant-respondent.

STONE, Judge.

This is an action by plaintiffs Byron J. Phegley and Fern Phegley against defendant Porter-DeWitt Construction Company, Inc., for damage to plaintiffs allegedly resulting from defendant's *negligence* in damming, diverting and discharging surface water onto plaintiffs' land. About ten months after institution of suit, the depositions of plaintiff Byron and defendant's job superintendent Matkin were taken. Some fourteen months later, defendant filed its motion for summary judgment; and shortly thereafter the trial court sustained that motion and entered judgment for defendant. Plaintiffs appeal.

From plaintiffs' petition and the depositions, we glean the following. Plaintiffs owned a tract of approximately fourteen acres, the contour of which was irregular (the legal description in the transcript being almost two pages in length) but roughly resembled that of an arrowhead pointed toward the west. This tract lay on the north side of old Missouri State Highway No. 21 (hereinafter "old 21") which ran in an easterly-westerly direction. "A small creek" known as Flat Creek, running in a general northeasterly direction, flowed under a bridge on old 21 at a point southwest of, but near, the west "arrowhead" point of plaintiffs' tract. Shortly prior to plaintiffs' acquisition of this tract, their predecessors in title had conveyed to the State the right-of-way for relocation of old 21 along an easterly-westerly course through the tract, roughly paralleling old 21 and a relatively short distance north thereof.

Defendant Porter-DeWitt Construction Company, Inc., was the contractor on an 8½ mile section of the new relocated Missouri State Highway No. 21 (hereinafter "new 21"), which included the relocated paved roadway through plaintiffs' tract

and a new bridge over Flat Creek at the "arrowhead" point thereof. Plaintiffs' petition asseverated that, in the course of such construction of new 21, defendant "removed" the Flat Creek bridge on old 21 and "filled in and dammed up the area underneath said bridge where said creek ran and diverted said creek, changing the course and direction of its flow into and through a culvert of insufficient size to properly carry off and drain the surface water accumulating in said creek thereby creating a damming effect" so that during heavy rains on December 27, 1968, and again on January 29, 1969, the creek overflowed and plaintiffs thereby were damaged in the particulars detailed.

At the time of those rains, "the slab" on new 21 in that vicinity "had been poured" but whether or not the new Flat Creek bridge on new 21 then had been completed is but one of many factual details concerning which the confused, confusing and (in some respects) conflicting depositional testimony leaves otherwise uninformed readers, such as ourselves, in grave doubt. Both deponents did agree that "a bypass" [1] had been constructed, and at the time of the aforesaid rains was still being used, for the purpose (as defendant's job superintendent Matkin explained) of handling "traffic from old 21 around that culvert [under the new Flat Creek bridge on new 21] to new 21 while the building of that culvert was being made and also while the pavement was being done in that area." Deponent Matkin described this bypass as an "earth fill" with "a base surfacing with two inches of asphaltic concrete on top of

that" and "a *sixty-six inch* corrugated metal pipe underneath it—*I believe the dimensions are correct—whatever the plans show . . . .*" (All emphasis herein is ours.) However, plaintiff Byron testified that defendant "left a *four-foot* tile in there [that] was not adequate to carry the water that came down Flat Creek." Whatever the size of the "pipe" or "tile" may have been Matkin and Byron agreed that indeed the bypass "held the water back" (as Matkin phrased it) during the heavy rains when plaintiffs' property was flooded.

Both deponents also were interrogated concerning another pipe, to wit, a pipe permitting drainage from (a) the "very shallow [east-west] ditch" along the south and upstream side of new 21 on its relocated easterly-westerly course through plaintiffs' tract to (b) the north and unditched downstream side of new 21. Plaintiff Byron opined that was a two-foot pipe, while defendant's job superintendent Matkin "believe[d]" it was "a twenty-four or thirty inch pipe—I don't remember offhand." According to Matkin, that pipe was open "at the beginning of the flood" [2] but "some of the lumber and whatnot from somewhere got into the end of the pipe" so that later "it wasn't running a full stream on the downstream (north) end of it . . . as to the amount of [flow] I wouldn't say."

Although the depositions of plaintiff Byron and Matkin obviously were not taken with a view to developing all of the relevant physical facts as upon trial, e. g., the precise location of plaintiffs' home, tool shed, "worm beds," [3] deep well pump, pond,

---

1. The exact location of the bypass is another factual detail left in a gray area. However. the petition and depositional testimony, taken as a whole, indicate that the bypass was at or near the location of the old Flat Creek bridge on old 21, and we do not particularize the allegations of the petition or the testimony bearing on this subject because our disposition of the instant appeal is governed and compelled by other considerations and could not be changed or affected by resolution of our uncertainty concerning this factual detail.

2. Both deponents at times used the terms "heavy rain" and "flood" interchangeably.

3. In connection with the operation of "a little bait shop" on the premises, some eight months prior to the first heavy rain plaintiffs had purchased and "planted" about 30,000 red worms from Georgia and 8,000 "Canadian crawlers" from Wisconsin in five "worm beds" of compost, manure and peat moss. Thereafter, they fed the worms "chicken laying mash" twice each week and periodically

etc., we are informed specifically that plaintiffs' trailer house was on the south or upstream side of new 21 as relocated along its easterly-westerly course through their tract and, upon searching examination of the depositional evidence, we are moved inferentially to the view that plaintiffs' tool shed, "worm beds" and deep well pump also were on the south or upstream side of new 21. All of the improvements must have been some distance east of the bypass and also the pipe under new 21. As indicative of the nature and extent of the back-up and overflow on plaintiffs' tract during the heavy rains in December 1968 and January 1969, we note plaintiff Byron's testimony that the water was eighteen to twenty inches deep in plaintiffs' tool shed, that their deep well pump was flooded out and ruined, that "some lumber stacked" south of new 21 was washed downstream to the north over that highway and into Flat Creek, and that approximately "five hundred yards" of loose dirt, much of it from "new fills and ditches" along new 21, likewise were washed to the north into a pond on that portion of plaintiffs' tract.

Defendant's position, both in the trial court and on appeal, is stated plainly and succinctly in the following portion of a letter (included in the transcript) from defendant's counsel to the trial judge shortly prior to entry of the summary judgment:

"In my opinion, the controling [sic] case is Rector v. Tobin Construction Co., 377 S.W.2d 409 [Mo. banc 1964]. The facts in that case are almost exactly like the facts in this case. It appears in our case that, according to State Highway Department plans, Porter-DeWitt had erected a temporary earthen fill for the purpose of moving machinery. The fill partially obstructed the channel of a water course. There came a heavy rain and plaintiff [sic] claims that as a result, his worm beds and other property were damaged. The depositions reveal that the construction was in exact accordance with State Highway Commission Plans. The Tobin case squarely rules the issue of liability in favor of the defendant. It is respectfully suggested that on this basis a summary judgment should be entered in favor of defendant, Porter-DeWitt."

To justify and support its position, defendant relies upon certain depositional statements by its job superintendent Matkin, which we now note. To the inquiry, "is it my understanding as to what you are telling me, that you and your people had constructed this thing according to highway specifications up to this point," Matkin answered, "yes, sir." Other questions afforded opportunities for Matkin to interpose generalized conclusionary (and usually unresponsive) statements, e. g., "As far as [defendant] is concerned, we can only build a highway one way, and that is the way it is designed to be built by the Highway Department, unless they tell us different"—"we have no say in how to build the highway; we only have one alternative, and that is to build it as plans are shown or by letter or change order from the Highway Department only." Defendant's counsel also point to Matkin's statement that "they [a representative of the State Highway Department] are on the job every day checking our work," but in this connection we observe that Matkin did not remember whether defendant was working on that construction project at the time of either the first or the second "flood." And, although we know judicially that governing statutes required this construction project to be done in accordance with plans, specifications and a contract entered

---

checked the worms and their rate of reproduction by actually examining and counting the worms in a small section of each bed. On the basis of the last such examination and count prior to the first heavy rain, plaintiff Byron estimated that the worm beds contained some 400,000 worms (including about 200,000 "big enough to sell"), all of which were drowned when the worm beds were flooded by the back-up and overflow on plaintiffs' tract.

into with the State Highway Commission, in the name of the State of Missouri [§ 227.110, RSMo 1969, V.A.M.S.], and obligated defendant to give a bond insuring "proper and prompt completion of said work in accordance with the provisions of said [contract], and plans and specifications" [§ 227.100(4), RSMo 1969, V.A.M.S.], and although we find that Matkin mentioned both the "contract" and the "plans" in his depositional testimony and remarked they were "in the truck," they were not produced then and, of course, are not before us on appeal.

■ In our opinion, *Rector,* supra, does not support entry of the summary judgment under review here. In *Rector,* "[n]egligence on the part of defendant . . . [was] completely disavowed by plaintiffs throughout the trial and [on appeal], and they insist they are proceeding exclusively on the theory of *trespass* . . . ." [377 S.W.2d at 413] In the case at bar, plaintiffs' petition sounds in *negligence* and that has been and is their theory of the case. The overwhelming weight of authority is that a contractor with a public body is not entitled to avail himself of the immunity of the latter from liability for injuries resulting from either wilful tort or *negligence* in the performance of public work. Annotation 9 A.L.R. 3d 382, 385 [§2a], 397 [§5]; 64 Am.Jur. 2d, Public Works and Contracts § 133, p. 1004. See particularly Stiers v. Mayhall, 207 Okl. 219, 248 P.2d 1047 (1952). That principle has been followed and applied in Missouri [Joshmer v. Fred Weber Contractors, 294 S.W.2d 576, 583(3, 4) (Mo. App.1956)], and we recognize it here. Furthermore, the judgment under appellate review in *Rector* was not a summary judgment but rather was a judgment rendered by the court nisi after the relevant facts and circumstances had been developed fully upon trial.

■ The basic principles governing appellate review of summary judgments entered under Rule 74, V.A.M.R., are well-settled. In ruling a motion for summary judgment, it is the duty of the trial court in the first instance, and it becomes our duty on appeal, to scrutinize the record in the light most favorable to the parties against whom the motion was filed and the judgment was rendered (in the case at bar, the plaintiffs), and to accord to such parties the benefit of every doubt. Wood v. James B. Nutter & Co., 416 S.W.2d 635, 636(1) (Mo.1967); Pagan v. City of Kennett, 427 S.W.2d 251, 252(1) (Mo.App. 1968). A summary judgment may be rendered where, but only where, it is made manifest by the pleadings, depositions and admissions on file, together with the affidavits, if any, that there is no genuine issue of a material fact and that the movant is entitled to judgment as a matter of law [Rule 74.04(c); Stanturf v. Sipes, 447 S. W.2d 558, 560 (Mo.1969), 35 A.L.R.3d 834; E. O. Dorsch Elec. Co. v. Knickerbocker Const. Co., 417 S.W.2d 936, 938 (Mo. 1967); Weber v. Les Petite Academies, Inc., 490 S.W.2d 278, 279(2) (Mo.App. 1973)]; " '[a] genuine issue of fact exists for the purpose of avoiding a summary judgment whenever there is the slightest doubt as to the facts' " [Maddock v. Lewis, 386 S.W.2d 406, 409 (Mo.1965), cert. denied 381 U.S. 929, 85 S.Ct. 1569, 14 L. Ed.2d 688; Pitman Mfg. Co. v. Centropolis Transfer Co., 461 S.W.2d 866, 873 (Mo. 1971); Spires v. Lawless, 493 S.W.2d 65, 68 (Mo.App.1973)]; and the burden rests upon movant, in this instance upon defendant, to show by "unassailable proof" [Rule 74.04(h)] that there is no genuine issue of fact [Nelson v. Browning, 391 S.W.2d 873, 877(1) (Mo.1965); Clampett, Summary Judgments in Missouri, 22 J.Mo.Bar. 14, 17 (1966)] and that movant is entitled to judgment as a matter of law. Brooks v. Cooksey, 427 S.W.2d 498, 500(2) (Mo. 1968); Norman v. Willis, 402 S.W.2d 46, 47(1) (Mo.App.1966). Our appellate courts have repeatedly characterized a summary judgment as an extreme and drastic remedy and have warned that great care should be exercised in employing this procedure. See Citizens State Bank of

Nevada v. Wales, 469 S.W.2d 750, 753(3) (Mo.App.1971) and cases there collected in note 8.

A meticulous study of the transcript on appeal leaves us with considerably more than "the slightest doubt as to the facts" and compels the decision (so we are convinced) that, on the hereinbefore-quoted sweeping generalized conclusionary statements of deponent Matkin on which defendant's counsel necessarily depend, we may not reasonably find that defendant showed by "unassailable proof" that there is no genuine issue of fact and that movant is entitled to judgment as a matter of law. And it may not be amiss to suggest in this connection that, if defendant seeks refuge under the sovereign's umbrella of tort immunity for damage necessarily resulting from or incidental to defendant's *allegedly nonnegligent* performance of its contract with the sovereign, that contract and the accompanying plans and specifications should be produced and offered in evidence. In this connection, see Cure v. City of Jefferson, 380 S.W.2d 305 (Mo.1964). We are cognizant, as defendant's counsel remind us, that plaintiffs filed no counteraffidavit or other proof after the deposition of defendant's job superintendent Matkin was taken, but that does not require that summary judgment be entered for defendant where, as here, that action would be inappropriate. E. O. Dorsch Electric Co. v. Plaza Construction Co., 413 S.W.2d 167, 169–170(5) (Mo. 1967); Cure v. City of Jefferson, supra, 380 S.W.2d at 310.

The summary judgment for defendant is set aside and the cause is remanded to the circuit court for further proceedings not inconsistent with this opinion.

TITUS, C. J., and HOGAN, J., concur.

BILLINGS, J., not participating.