**SHADY VALLEY PARK & POOL, INC., Plaintiff/Respondent–Cross/Appellant,**

v.

**FRED WEBER, INC., Defendant/Appellant–Cross/Respondent.**

Nos. 66526, 66531.

Missouri Court of Appeals,
Eastern District,
Division Two.

Aug. 15, 1995.

Motions for Rehearing and/or Transfer to Supreme Court Denied Sept. 25, 1995.

Case Transferred to Supreme Court Oct. 24, 1995.

Case Retransferred to Court of Appeals Jan. 23, 1996.

Original Opinion Reinstated Feb. 5, 1996.

Riethmann and Valentine, Larry D. Valentine, Michael A. Shaughnessy, Jr., St. Louis, for appellant cross-respondent.

Gray & Ritter, P.C., Robert F. Ritter, John G. Simon, Joan M. Galli, St. Louis, for respondent cross-appellant.

PUDLOWSKI, Judge.

Defendant, Fred Weber, Inc., a construction company, appeals from the judgment entered on the jury verdict in the Circuit Court of Jefferson County in favor of Shady Valley Park and Pool, Inc. Shady Valley cross-appeals. Due to the flow of mud and siltation into its lakes from Weber's highway construction project, Shady Valley was forced to close both its wholesale fish hauling and fee fishing businesses. We affirm in all respects.

We review the evidence in the light most favorable to the jury verdict. *Steif v. Limpiphiphatn,* 814 S.W.2d 695, 695 (Mo.App.E.D. 1991). The Missouri Highway and Transportation Commission (MHTC) hired Weber to make improvements to Missouri State Highway 21. The construction project was in two phases. Project 387, Contract 25 (Phase I), which began in September, 1987, involved clearing, excavating and grading the land for a new section of Highway 21. The contract for Phase I contained the special provision regarding Shady Valley:

> The Contractors (sic) attention is directed to the Shady Valley Lakes Fishing area located right of approximate Station 270+00.
>
> The lakes in this area are stocked with fish daily, as a result, it will be necessary to take every precaution to insure mud and siltation are kept to a minimum during grading operations.

Project 17b (Phase II), which was immediately to the south of Phase I, involved similar operations. Phase II began in the fall of 1988, while Phase I was still underway. The entire operation took place above Shady Valley's property.

Shady Valley was a family owned and operated business. Gene Lambrich and other members of his family had purchased the property in 1965 and operated a swimming pool. In approximately 1967, they decided to convert the property to a fee fishing area. They dug two lakes on the property, one approximately two acres and one approximately five acres. The lakes were filled by a combination of spring water and rain water. The business consisted primarily of fee fishing and commercial fish hauling, as well as a bait & tackle store. As part of the business, the Lambrichs turned an old swimming pool into fish raceways, which were designed to hold live fish. The six raceways required 500 gallons of water per minute, which was pumped in from the lakes. They used the fish from the raceways to stock the lakes and for the fish hauling business. The raceways enabled Shady Valley to raise several different species of fish; this gave it an advantage over its competition who were only able to raise one species. Quality water was ex-tremely important to the success of both the fee fishing and fish hauling businesses. Before the highway project began, the water quality was good and the lakes were exceptionally clear.

Prior to the start of construction, the land around Shady Valley was covered with trees, brush, grasses and wildflowers. The area had extensive tree cover and a deep vegetative mat consisting of leaves, grass and bushes. This type of covering helped dissipate the energy of precipitation which minimizes soil loss and erosion.

In September, 1987, Weber began Phase I. Weber and its subcontractor, Bloomsdale Grading Company, put their office trailers on Shady Valley's property. Implementing the plans of the MHTC, Weber began clearing and grubbing, i.e. removing the roots and stumps of trees. These operations, which involved stripping the ground to the bare soil, were directly above the Shady Valley lakes. According to Eugene Hofstetter, Weber's Project Superintendent for this construction, the entire right-of-way above Shady Valley was cleared by February or March, 1988.

Phase II of the project began in the fall of 1988. Robert Masselink, an engineer specializing in civil geo-technical engineering, testified that all of the drainage or siltation from the second project travelled through the ditch systems constructed in the first project. In order for the materials from Phase II to get into the lakes, they had to travel through Phase I. Therefore, according to Masselink, the projects overlapped in terms of construction.

Wanda Lambrich, Vice–President and Secretary–Treasurer of Shady Valley, testified that in early 1988 the effects of the construction could be seen. She testified that when it rained, "the lakes would turn to red mud." Wanda further testified that after it would rain, it would take a lot longer for the lakes to clear.

William Witwicky, a customer of Shady Valley since 1972, testified that he noticed the mud and siltation flowing into the small, upper lake in early 1988. He testified that he could see ruts in the mud which were

carved out after heavy rains. He stated that he used to comment to his brother that "it wouldn't take long for that lake (the small lake) to fill up." He further testified that the mud and siltation that had flowed into the lake made it a lot shallower and that the lake stayed muddy all of the time. He noticed that the customers dwindled and the fishing slowed and suffered.

Harley Utz, who had fished several times a week at Shady Valley since 1971, testified that he saw mud flowing into both the little and the big lake after the construction started. He further testified that prior to the grading operations, the lakes would clear in a day or two after a very hard rain. After construction began, he stated that the lakes would never clear up and remained muddy and murky. Utz testified that the small lake, which was clearly his favorite, was forced to close in 1989 because it was too shallow due to the mud and silt that had flowed into it.

Patsy Wright, another longtime customer, testified that she used to bring her six children fishing at Shady Valley. When she first began fishing at Shady Valley, the water was clear and the fishing was good. She said that the area was always crowded around both lakes. She testified that as soon as the construction started she noticed that the lakes were significantly muddier. The quality of fishing declined to the point where she was unable to catch anything. She used to be able to see fish in both lakes. After the grading began, she was only able to see the water moving where the fish were. She stated that the big lake never cleared up after construction began. She quit fishing there in 1990.

In an effort to prevent the mud and siltation from flowing into the lakes, Weber took the following steps.

1) installed a siltation fence;

2) placed rock in the creek which fed into the smaller of the two lakes;

3) staked bales of hay in front of a pipe which brought runoff water from the other side of the new highway into the creek;

4) lined the banks of the inlet creek to keep them from washing away;

5) After the grading of Phase I was complete, put down lime, seed, straw mulch and liquid mulch overspray in an effort to prevent further mud and siltation from flowing into the lakes.

Furthermore, at a time when Weber believed that it was not responsible for the damage to Shady Valley's lakes, Weber made two separate proposals to dredge the lakes at a reduced price. In exchange, Weber wanted Shady Valley to indemnify and hold forever harmless Weber and its subcontractors. Shady Valley declined the offers.

As the problems with the mud and siltation worsened, it became increasingly difficult to draw the necessary amount of good quality water to support the businesses. The water from the lakes, when laden with mud, silt and clay could no longer be used to supply water to the raceways. When muddy water was used, it would kill the fish. Due to the difficulties the raceways had holding an inventory, Shady Valley had trouble making on time deliveries of healthy fish to its customers. Eventually, it lost contracts to deliver live fish, including one with the Missouri Department of Conservation to supply fish for hundreds of Missouri lakes. Hofstetter, Weber's Project Superintendent, testified that as the project continued, he noticed that the smaller lake started to fill up with silt. He also noted that customers had dwindled on the small lake. The small lake, the favorite of most of the customers, was closed in July, 1989. When the small lake closed, it was only one to one and one-half feet deep; previously it had ranged in depth from seven to twelve feet. The fishing operation closed in July, 1991 and the entire operation closed its doors in October, 1991.

Prior to the business closing down, Gene Lambrich sought relief from Weber and the MHTC. In April, 1989, Lambrich detailed his concerns regarding the siltation caused by the construction of New Route 21 in a letter directed to the MHTC. On May 2, 1989, Lambrich received a written response from J.T. Yarnell of the MHTC. The letter indicated that the matter had been discussed with Weber and that Weber planned to excavate the upper lake to remove the material that had washed in. In August, 1989, Lam-

brich received the aforementioned release and indemnity agreement from Weber in which it offered to clean out the small lake for only 75% of actual cost plus 10%. As discussed *supra,* the agreement required Shady Valley to "indemnify and hold Weber harmless" from any further claims. Shady Valley declined the offer.

On January 4, 1990, Lambrich again wrote the MHTC outlining his problems since the start of construction. This letter detailed the problems that Shady Valley had experienced since the start of the new Highway 21 project. Lambrich identified specific problems including noise and dust created while excavation was being done and the severe problems of the mud, gravel, silt and straw that had completely filled in the upper, smaller lake forcing it to be closed down for fishing in July, 1989. He also stated that the lower lake was in danger as more mud, silt and gravel flowed into it. In addition, he pointed out problems with the muddy water in the lakes and the raceways which resulted in fish losses from 1987, 1988 and more so in 1989. Lambrich made it clear that he had expected to be inconvenienced but had not been prepared for the "destruction of his business and possible loss of his livelihood." The MHTC responded on January 17, 1990:

> Our contract with Weber Construction Company specifically addressed the potential for possible siltation of your lakes during the Highway 21 construction project. In light of the specific contractual provision alerting the contractor to the potential for siltation, we feel your claim should be submitted to Fred S. Weber Construction or their insurance company.

Weber responded on January 24, 1990 that it was not responsible for the siltation of Shady Valley's lakes and " ... there is nothing we can do at the present time to remedy the situation."

On June 18, 1990, Shady Valley filed its original petition naming Weber and the MHTC as defendants. Shady Valley later filed a six count amended petition. W.J. Menafee Construction Company was named in the amended petition, but was later dismissed. Shady Valley's petition had separate counts for trespassing and inverse con-

demnation, nuisance, negligence by the MHTC only, negligence by Weber and Menafee, punitive damages, and a third-party beneficiary contract claim against Weber and Menafee.

On April 21, 1994, the MHTC was severed from the case against Weber. Between April 24, 1994 and May 10, 1994, the cause against Weber was tried to a jury. The trial court directed a verdict against Shady Valley on its claim for breach of third-party contract and punitive damages. The jury returned a verdict in favor of Shady Valley in the amount of $3,000,000.00, finding against Weber on both the trespass and negligence claims. Weber appeals that judgment; Shady Valley cross-appeals.

■ In its first point on appeal, Weber argues that the trial court erred in not directing a verdict in its favor because it is not liable for the injuries to Shady Valley after its work had been accepted by the MHTC. We disagree.

■ The "Acceptance Doctrine," upon which Weber relies, states that once a highway contractor's work has been accepted by the state, the contractor is not liable to third parties with whom there is no contractual relationship for injuries resulting from tortious conduct; acceptance may be constructive or practical rather than formal. *Coleman v. City of Kansas City, Mo.,* 859 S.W.2d 141, 146 (Mo.App.W.D.1993); *Pataky v. Mertens Const. Co.,* 829 S.W.2d 38, 40 (Mo.App. E.D.1992). *See also Gast v. Shell Oil Co.,* 819 S.W.2d 367, 370 (Mo. banc 1991); *Roskowske v. Iron Mountain Forge Corp.,* 897 S.W.2d 67 (Mo.App.E.D.1995); *John and Kaye Becker v. Setien d/b/a Structural Steel and Havens Steel Co.,* 904 S.W.2d 338, 343– 46 (Mo.App.W.D.1995); *Honey v. Barnes Hosp.,* 708 S.W.2d 686, 700 (Mo.App.1986). Weber's reliance on the Acceptance Doctrine is misplaced due to the particular facts of this case.

■ All of the cases which employ the Acceptance Doctrine to bar the contractor's liability involve a single event or injury which results in damage to the third party. Weber cites no cases in any jurisdiction nor was this court able to find any authority in its own

independent research in which the injury began prior to acceptance and continued through and after acceptance. We find that the Acceptance Doctrine is not applicable to such a set of facts.

In the instant case, Weber began grading operations directly above Shady Valley in September, 1987. According to Weber's Project Superintendent, the entire right-of-way above Shady Valley was cleared by February, 1988. As early as late 1987 and early 1988, the lakes at Shady Valley were being harmed. When it rained, dirt, silt and clay entered the lakes. The lakes became muddier than they had been prior to Weber beginning work and took much longer to clear than they had previously. In fact, they remained muddy and murky.

The earliest date that we could possibly find acceptance by the MHTC was June 4, 1988. On June 3, 1988, Weber put down lime, seed, straw mulch and liquid mulch overspray. According to the MHTC Resident Engineer on the project, twenty-four hours after Weber prepared the graded area of Phase I, the MHTC accepted that work and took control of maintenance of the area. This is the best case scenario for Weber. However, the parties dispute whether or not Phase II affected Shady Valley. If Phase II contributed to the mud and siltation problem as testified to by Shady Valley's expert, acceptance could have been as late as January 9, 1991, the date Phase II was formally inspected and accepted.

■ We do not need to determine the precise date of acceptance. By June of 1988, the injury to Shady Valley's lakes had certainly commenced. We recognize that acceptance is still a significant event. *Gast v. Shell Oil Co.*, 819 S.W.2d 367, 371 (Mo. banc 1991) citing Restatement (Second) of Torts, Sec. 385 comment d (1965). However, because the damage to the lakes began prior to any conceivable acceptance, the Acceptance Doctrine does not apply.[1]

Therefore, the general principle that a contractor is liable for negligence or torts that occur while he is in possession of the premises holds Weber liable for the injuries to Shady Valley. *Guthrie v. Reliance Const. Co.*, 612 S.W.2d 366, 369 (Mo.App.1980); *Phegley v. Porter–DeWitt Construction Co.*, 501 S.W.2d 859, 863 (Mo.App.1973); *Joshmer v. Fred Weber Contractors*, 294 S.W.2d 576, 582–583 (Mo.App.1956). Point I is denied.

■ Weber's second and third points contend that the trial court erred in giving certain jury instructions. Weber did not set forth the challenged instructions in its brief as required by Rule 84.04(e). Accordingly, Weber did not preserve either point for appellate review. *Dennis v. St. Louis Board of Education*, 809 S.W.2d 20, 22 (Mo.App.E.D. 1991). Points II and III are denied.

■ In its fourth point on appeal, Weber contends that the trial court erred in giving Instruction No. 9, based on MAI 4.01. Weber argues that it was error because it gave the jury a roving commission to compensate Shady Valley for "all damages for all time" when the proof was that Weber was not responsible for all of the project and was not responsible for any of the project after acceptance. Weber asserts that Shady Valley's claim against Weber was really for permanent public nuisance and for damages to real property alone. We disagree with Weber's position.

The submitted instruction read as follows:

If you find in favor of plaintiff, then you must award plaintiff, Shady Valley Park and Pool, Inc. such sum as you believe will fairly and justly compensate plaintiff for any damages you believe it sustained and

1. There are several exceptions to the Acceptance Doctrine, which hold a contractor liable despite acceptance, as were discussed by the Supreme Court in *Gast v. Shell Oil Co.*, 819 S.W.2d 367, 371 (Mo. banc 1991), including: a) departure from specifications that could not be discovered by reasonable investigation; b) the dangerous character of the structure or condition, unknown to the owner; c) hidden defects in the project which were not discoverable by the proprietor; and d) specifications that are "so imperfect or improper that the ... contractor should realize that the work done thereunder will make the structure or condition unsafe ..." quoting Restatement (Second) of Torts, Sec. 384, comment f (1965). None of these exceptions are germane to the present case because of our holding that the Acceptance Doctrine does not apply to these facts.

is reasonably certain to sustain in the future as a direct result of the mud and siltation from the construction project mentioned in the evidence.

■ In determining whether the evidence was sufficient to support a jury instruction, the evidence is viewed in the light most favorable to the offering party, and we give the offering party the benefit of all favorable inferences. *Garrett v. Overland Garage & Parts, Inc.,* 882 S.W.2d 188, 190 (Mo.App. E.D.1994).

■ Weber argues that MAI 9.02, entitled "DAMAGES—EMINENT DOMAIN—PART OF PROPERTY TAKEN," was the proper damage instruction because it believes that Shady Valley's claims are truly for a permanent nuisance. Weber mischaracterizes Shady Valley's claim for damages. Shady Valley claims damages for negligence and trespass that ultimately led to the close of its business. The injury was not to the lakes alone. As a result of the mud and siltation which flowed into the lakes, Shady Valley had to close both its wholesale fish hauling and fee fishing businesses. Clearly, this was not damage to real property alone. In a negligence action, the plaintiff may recover damages which are the direct or proximate result of the occurrence. *See Schaffer v. Bess,* 822 S.W.2d 871, 876 (Mo.App.E.D. 1991). A trespasser is liable to respond in damages for the natural, necessary, direct and proximate consequences of his wrong. *Crook v. Sheehan Enterprises, Inc.,* 740 S.W.2d 333, 336 (Mo.App.E.D.1987). MAI 4.01 was entirely appropriate under Shady Valley's evidence. It is appropriate when the damage goes beyond mere property loss. *See Wright v. Edison,* 619 S.W.2d 797, 800 (Mo.App.1981). Furthermore, as discussed, *supra,* Weber is liable for all of the damage to Shady Valley; the Acceptance Doctrine is inapplicable to these facts. Therefore, we hold that the trial court did not commit error in giving Instruction No. 9. Point IV is denied.

■ In its fifth point on appeal, Weber argues that the trial court erred in not submitting either of two instructions proffered by Weber. Weber wanted an instruction based on MAI 6.01 which would have allowed

the jury to consider any mitigating circumstances. Alternatively, Weber wanted a comparative fault instruction.

■ "The burden of proof of mitigation of damages is on the defendant who must show the opportunity the injured party had to mitigate and the reasonable perspective consequences." *Shaughnessy v. Mark Twain State Bank,* 715 S.W.2d 944, 955 (Mo.App. 1986) quoting *Braun v. Lorenz,* 585 S.W.2d 102, 108 (Mo.App.1979). In the absence of evidence of mitigating circumstances, the issue of mitigation fails. *Smith v. City of Miner,* 761 S.W.2d 259, 260 (Mo.App.1988).

In the case before us, Weber presented no evidence that Shady Valley had the opportunity to mitigate its damages. On the contrary, Lambrich testified that he attempted to mitigate Shady Valley's damages. He erected a sand and gravel filtration system for pipes that fed water into the fish raceways from the lake. This was ineffective due to the large volume of mud, siltation and straw in the water which clogged the pipes. In addition, he consulted a biologist, Dr. Leo Eldridge from Ralston Purina, and an aquaculturist, Jim Kahrs, who testified at trial on behalf of Shady Valley, regarding the problems and possible solutions.

Weber contends that Shady Valley failed to mitigate its damages when it declined Weber's offers to dredge the lakes. As outlined above, in 1989, Weber offered to dredge the little lake for actual cost plus 10%, of which Shady Valley would only have had to pay 75%. Weber also offered to dredge the large lake for $40,000.00 if the dredged material was deposited on Shady Valley's property or $130,000.00 if the material was removed and dumped elsewhere. According to Weber's offer, Shady Valley would have had to pay 90% of the cost. Lambrich got an independent estimate of $300,000 from Brooks Excavating to remove all of the silt from both lakes.

We disagree that dredging the lakes would have been a mitigating action. It would have been an affirmative action while the injury was still occurring. Lambrich testified that dredging the lake would not have solved his problem. The problem was an ongoing one

concerning not only the quality of water already in the lakes, but also the quality of water that was continuing to flow into the lakes. It was not simply a question of removing the silt that had accumulated at the bottom of the lake. Furthermore, Lambrich testified that it was beyond his abilities to finance the dredging. Accordingly, we hold that the trial court did not abuse its discretion in denying Weber's proffered MAI 6.01 instruction or its comparative fault instruction. Point V is denied.

In its final point on appeal, Weber argues that the trial court abused its discretion by: a) severing the MHTC from the proceedings only four days prior to trial; b) ordering Weber not to mention the MHTC or Shady Valley's pending claim against it; and c) reading to the jury a withdrawal instruction based on MAI 34.01 instructing the jury that the MHTC and the State of Missouri were not parties to the trial.

The trial court entered an order severing MHTC from the case in order to:

... simplify the trial and submission of disparate issues presented in these cases and to avoid prejudice as a result of evidence that is includable in the Fred Weber, Inc., case and excludable in the MHTC case and to allow MHTC to pursue it's pending application for Writ of Prohibition on discovery matters (sic) the Court pursuant to Supreme Court Rule 66.02 orders separate trials as to those two cases.

■ Missouri Supreme Court Rule 66.02 grants the trial court broad authority to order separate trials. At the court's discretion, separate trials may be ordered for reasons of convenience, to avoid prejudice or for reasons of judicial economy. Any decision to grant a separate trial will not be disturbed unless this discretion is abused. *State ex rel. Sago By and Through Sago v. O'Brien*, 827 S.W.2d 754, 755 (Mo.App.E.D. 1992). We find no abuse of discretion nor has Weber shown any.

■ Withdrawal instructions are appropriate to avoid misleading the jury with improper evidence. MAI 34.01; *State ex rel. Mo. H.T.C. v. Union Realty*, 827 S.W.2d 768, 770 (Mo.App.E.D.1992). The giving or refusing to give a withdrawal instruction is discretionary and reviewable for abuse. Abuse occurs when the trial court's ruling is clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *Id.*

■ During its opening argument, Weber's counsel stated that "... I need to remind you at this point the evidence isn't going to show you that I represent the Highway Department. I don't, I represent Fred Weber. **The Highway Department is part of this lawsuit. They're not here today for this trial.**" (emphasis added). Where the evidence is of a character that might easily lead to the raising of a false issue, the court ought to guard against such an issue by appropriate instruction. *Sampson v. Missouri Pacific R. Co.*, 560 S.W.2d 573, 584 (Mo. banc 1978). In light of the statement in opening argument and all of the evidence elicited regarding the plans, specifications and acceptance of the MHTC, we do not find that the trial court abused its discretion in issuing the instruction modeled after MAI 34.01.

■ Weber further contends that it was prejudicial for the trial court to order its counsel to refrain from mentioning that Shady Valley had also sued the MHTC. We disagree.

The trial court ordered Weber to refrain from stating that MHTC was a party to this particular lawsuit. They were not restrained from asserting that the MHTC was the party that hired Weber, designed the plans and specifications for the project, accepted the project, and paid for the construction. The MHTC had been severed from the lawsuit prior to trial. In light of the comments made during opening arguments, the trial court properly proscribed Weber from asserting that the MHTC was a party to the lawsuit, which they were not.

Accordingly, Point VI is denied. Weber's appeal is denied.

■ We next address the issue of punitive damages raised by Shady Valley in its cross-appeal. Shady Valley contends that

the trial court erred in directing a verdict in favor of Weber on the issue of punitive damages. On the theories of negligence and trespass which were submitted to the jury, Shady Valley contends that it was entitled to punitive damages because Weber showed complete indifference to or conscious disregard for the rights of Shady Valley. We disagree.

Granting a motion for directed verdict is a drastic action, and a trial court should do so only " 'when all the evidence and the reasonable inferences to be drawn therefrom are so strongly against the plaintiff that there is no room for reasonable minds to differ.' " *First Nat. Bank of Fort Smith v. Kansas City Southern Ry. Co.,* 865 S.W.2d 719, 726 (Mo. App.W.D.1993) *quoting Schroeder v. Lester E. Cox Medical Center, Inc.,* 833 S.W.2d 411, 414 (Mo.App.S.D.1992). In reviewing whether Shady Valley made a submissible case on punitive damages, we view the evidence in the light most favorable to it and give it the benefit of all reasonable inferences to be drawn from the evidence and disregard all contrary inferences. *Id.* The standard for determining whether Shady Valley made a submissible punitive damages claim is whether a reasonable juror could have found that Weber's conduct showed complete indifference to or a conscious disregard for Shady Valley. *Id.* The Missouri Supreme Court has cited with approval Restatement (Second) of Torts Sec. 908(1) Comment b (1979), which suggests that there must be "some element of outrage to justify punitive damages." *Burnett v. Griffith,* 769 S.W.2d 780, 789 (Mo. banc 1989); *Bhagvandoss v. Beiersdorf, Inc.,* 723 S.W.2d 392, 397 (Mo. banc 1987).

Weber built the road and due to the construction, Shady Valley's fee fishing and fish hauling businesses were destroyed. The contract for the construction did contain a clause which stated that "The lakes in this area are stocked with fish daily, as a result, it will be necessary to take every precaution to insure mud and siltation are kept to a minimum during grading operations." However, Weber did not design the plans and specifications for the project; the MHTC did. Weber, as the contractor, simply followed the plans of the MHTC. Weber made efforts to prevent or limit the mud and siltation which

flowed into the lakes. Weber put a siltation fence in place, which was subsequently washed away. It placed rock in the creek which fed into the smaller of the two lakes. Weber staked bales of hay in front of a pipe which brought runoff water from the other side of the new highway into the creek. Weber lined the banks of the inlet creek to keep them from washing away. After the grading was complete, Weber put down lime, seed, straw mulch and liquid mulch overspray in an effort to prevent further mud and siltation from flowing into the lakes. In addition, at a time when it believed that it was not responsible for the damage to Shady Valley's lakes, Weber offered to dredge the lakes for a reduced amount. It also offered to forebear on the collection of any amount due as a result of the dredging until Shady Valley attempted to collect the cost of dredging from the MHTC.

Although Weber's actions were ineffective and ultimately caused it to be liable for the damages to Shady Valley, they do not rise to the level of justifying punitive damages. The uniform tenor of the recent cases is that punitive damages are to be the exception rather than the rule, and that they are to be confined to cases in which the evidence supports the award. *Menaugh v. Resler Optometry, Inc.,* 799 S.W.2d 71, 75 (Mo. banc 1990). There is no element of outrage in this case. Despite the ineptness of Weber's efforts to prevent the mud and siltation from entering the lakes, there was not a conscious disregard nor a complete indifference for Shady Valley's lakes. We conclude that punitive damages were properly not submitted. Shady Valley's point is denied.

Due to our holding affirming the judgment against Fred Weber, we do not address Shady Valley's second point in its cross appeal regarding an alternate theory of recovery based upon breach of a third party beneficiary contract.

The judgment of the trial court is affirmed in all respects.

SMITH, P.J., and WHITE, J., concur.