**Robert L. YAEGER, Plaintiff/Appellant,**

v.

**OLYMPIC MARINE COMPANY and B.N.B. Towing Service, Inc., Defendants/Respondents.**

No. 73510.

Missouri Court of Appeals, Eastern District, Division Three.

Dec. 22, 1998.

Lon D. Weaver, East Alton, IL, for Appellant.

Gary T. Sacks, Goldstein and Price, L.C., St. Louis, for Respondents.

PAUL J. SIMON, Presiding Judge.

Robert Yaeger (plaintiff) appeals from a judgment entered on a unanimous jury verdict in the Circuit Court of the City of St. Louis in favor of Olympic Marine Company and B.N.B. Towing Service, Inc. (defendants) on plaintiff's claim for personal injury under the Jones Act, 46 U.S.C. section 688, and the general maritime law of the United States.

On appeal, plaintiff contends that the trial court erred in (1) denying his motion for new trial because the jury verdict was patently against the manifest weight of the evidence adduced at trial; (2) admitting evidence of plaintiff's cluster headaches, prior right shoulder injury, prior skull fracture, being "beaten up" at age sixteen, prior pulled muscle, prior alcohol treatment, and general drinking habits because such evidence was irrelevant, immaterial, and lacked competence; (3) admitting evidence of plaintiff's low back injury in 1974 because such evidence was admissible only for the limited purpose of showing that plaintiff, as alleged in Olympic Marine Company's counterclaim, misrepresented his medical history, and was irrelevant, immaterial, and lacked competence with respect to the injuries of which plaintiff complained in his case; and (4) allowing a juror to remain on the jury because the juror knew a member of defendants' law firm to be a patron of the juror's bar. We affirm.

The record, viewed in a light most favorable to the verdict, reveals that at approximately 7:30 a.m. on March 8, 1993, plaintiff fell down the wheelhouse stairs of the M/V Mary Burke, operated by his employer, Olympic Marine Company (Olympic), when it collided with the M/V Valley Sunrise, operated by B.N.B. Towing Service, Inc. (B.N.B.). At 8:20 a.m., plaintiff went to a clinic of BarnesCare Corporate Health Services, where Susan Singer, M.D., diagnosed him with mild cervical strain and mild lumbar strain. She ordered x-rays of his neck, lower back, and tailbone and found "no evidence of fractures or anything out of alignment." She examined his neck, trapezius muscles, and lower back by "feeling along the muscles," found no muscle spasm, but found "a little bit" of tenderness across his trapezius muscles. When James Patterson, Olympic's vice president, visited plaintiff at the clinic, plaintiff stated that he "was a little woozy" but "thought he was all right." Dr. Singer scheduled another appointment for March 12 and completed a certificate of fitness which stated that plaintiff could return to "regular duty" work on March 9. Plaintiff, whose schedule involved working "four days on and four days off," told Dr. Singer that he was not "due back to work" until March 13.

When plaintiff returned to the clinic on March 12, he reported that his lower back felt better but that "his neck was still bothering him somewhat in the mornings." A physician's assistant determined that "he was

generally improving," prescribed physical therapy and stretching exercises, and scheduled another appointment for March 15.

The record is unclear concerning when plaintiff first returned to work following the accident. Plaintiff's wife, Margherita Yeager (wife), initially stated that he returned in August 1993 but then said that he returned two weeks after the accident. Plaintiff's family doctor since 1991, John E. Emmons, D.O., whom plaintiff visited on March 24, 1993, initially did not remember whether plaintiff "was off work" in late March 1993, but later stated that "the first time was on the 14 th [of April 1993] when he returned to work." Plaintiff himself stated that he "tried to get back as fast as [he] could" and "ma[d]e an effort to return" in April 1993. On the other hand, his testimony on cross-examination suggests that he returned prior to seeing Dr. Emmons on March 24. Furthermore, Mr. Patterson's testimony suggests that plaintiff returned to work prior to April. At trial, plaintiff's attorney introduced exhibits which included payroll sheets but those exhibits are not in the record. Testimony elicited concerning those payroll sheets does not clearly establish when plaintiff returned to work.

Following his visit to the clinic on March 12, plaintiff received physical therapy and returned to Dr. Singer as scheduled on March 15, reporting that "he was a lot better overall." Dr. Singer prepared a certificate of fitness which contained a diagnosis of "lumbar strain, resolved" and "cervical and [right] trapezius strain, improving," instructed plaintiff to perform muscle stretching exercises for his neck and to take a muscle relaxer as needed, and stated that he could return to "regular duty" work on March 16. She determined that "he was recovering normally from a soft tissue injury and appeared to be doing well," that she "found no evidence to make [her] think he had any other medical problems going on," and that she "did not see anything to make [her] think that there would be any permanent injury." Although she scheduled another appointment for March 25, he did not keep it. He did not see Dr. Singer again after March 15, 1993.

At some point between March 12 and April 14, 1993, plaintiff returned to work but reported that he remained "in some pain" and "couldn't do the work." He said that he "did okay for that first couple of days but it started to get to [him]." He asked for and received permission to see Dr. Emmons, whom he visited on March 24. Plaintiff complained of pain in his neck, back, knees, elbows, and hands. Dr. Emmons found that plaintiff suffered from "multiple somatic dysfunctions in the neck, the thoracic region, and the low back, with these being most acute in the cervical and thoracic area," and "pelvic somatic dysfunction and a sacroiliac dysfunction on both sides." Although Dr. Emmons described a "somatic dysfunction" as "impairment of the normal functioning of the skeletal system, the joint arthrodial system, with involvement of the related components of the vascular, nervous, and lymphatic system in the area," Dr. Singer characterized it as a term which "usually means they can't find very much wrong at all." Dr. Emmons treated plaintiff with osteopathic manipulative therapy (OMT), electrical muscle stimulation, and moist heat packs and prescribed anti-inflammatory medication and a muscle relaxer.

Plaintiff returned to Dr. Emmons on March 29, reporting improvement except in his neck and upper back, where pain exacerbated after he recently played with his three year-old daughter. Dr. Emmons doubted that plaintiff's daughter "did that much in the way of further injury." Dr. Emmons "continued with" the same diagnosis and treatment course. Plaintiff returned on March 31, reporting "some significant improvement, only complaining of minimal discomfort on that date." He visited again on April 3, complaining of "some slight worsening of his pain in the region between his shoulder blades." Dr. Emmons continued the same treatment course and prescribed stretching exercises. On April 9, plaintiff returned, stating that his neck felt "improved" but that he "had a bad day the day prior to the exam." Dr. Emmons then issued a letter stating that plaintiff could "be considered fit to return to work without restrictions as of April 12, 1993."

According to Mr. Patterson, plaintiff then "worked for a period of time again and once again stated that he was having difficulty doing the work and needed some more time off." Plaintiff visited Dr. Emmons on April 19, stating that he could not work for a full day and complaining that he felt more pain in his neck, upper back, lower back, elbows, and knees since returning to work on April 14. Dr. Emmons's diagnosis remained the same. He ordered x-rays of plaintiff's neck and upper back and planned to schedule physical therapy if the x-rays showed "no evidence of trauma to the body elements." The x-rays revealed only "some minimal arthritis" of no clinical significance. On April 27, Dr. Emmons prescribed physical therapy to focus on areas where plaintiff had muscle spasm and joint soreness.

On June 23, plaintiff returned to Dr. Emmons's office. Dr. Emmons noted a "trigger point" or a "focal area of muscle spasm and tenderness, at the level of the fifth thoracic vertebra, just at the left of the midline," which he wanted to treat with iontophoresis over a period of six days to relieve the inflammation. Plaintiff received such a treatment on June 25. On June 28, plaintiff "had some blood work drawn and a urinalysis" so that Dr. Emmons could look for "evidence of muscular problems and inflammatory changes in the blood." Dr. Emmons saw plaintiff again on July 7, noting an elevated level of creatine phosphokinase (CPK), which "indicated that [plaintiff] had more of a muscle problem than [Dr. Emmons] originally had surmised."

On July 14, plaintiff saw Dr. Lee Vander-Lugt, an orthopedic surgeon, who diagnosed "thoracic somatic dysfunction, rule out fracture," recommended a bone scan of the thoracic area, and advised that plaintiff continue physical therapy and undergo a program of "work hardening" to strengthen plaintiff and "get him ready to go back to work." At this time, plaintiff complained primarily of difficulty in his thoracic and cervical area. He did not receive the bone scan.

Plaintiff returned to Dr. Emmons on August 31, reporting that he finished the work hardening program and that he felt "only minimal discomfort in his low back." He also reported difficulty sleeping at night but attributed that to "stress from other sources," including "the ex-wife giving him some trouble." Dr. Emmons examined plaintiff and found "somatic dysfunctions in the neck, the mid thoracic, and the lumbar spine," but noted that "those were much improved from his last visit." Plaintiff received OMT and wife received instruction in soft tissue massage to address plaintiff's muscle spasm. Dr. Emmons determined that his continuing diagnoses of somatic dysfunction in the neck, thoracic area, and lower back "were related to the incident of [plaintiff's] falling on the boat." He found no "significant pathology other than some mild bruising initially" regarding plaintiff's hands, knees, and elbows.

During this visit, Dr. Emmons "added some further diagnoses – marked anxiety, marked depression, and sleep disturbance." Regarding plaintiff's anxiety and depression, Dr. Emmons noted, "I suspect there's a high probability that it's related to the accident." Plaintiff became frustrated because he "couldn't really do anything," "couldn't do the job," and "was just kind of locked in the house." Nevertheless, Dr. Emmons issued a letter releasing plaintiff "to return to work without restrictions, effective September 6, 1993." Additionally, Dr. Emmons prescribed an anti-depressant, an anti-anxiety agent, and a sleeping medication. Also during this visit, as elicited from Dr. Emmons while testifying on direct for plaintiff, plaintiff "reported that he was drinking approximately eight beers per day and that he was not drinking when he was working."

According to Mr. Patterson, Olympic then "sen[t] Mr. Yeager back to work for a third time," whereupon plaintiff "worked for a fairly extensive period." On September 16, plaintiff again visited Dr. Emmons, reporting that "he had almost totally stopped drinking." Plaintiff stated that, prior to taking the sleeping medication, "he had never been able to sleep without drinking alcohol before bedtime." Dr. Emmons found that the medication he prescribed helped plaintiff "wean himself off the beer as far as using it as a medication." Dr. Emmons still found plaintiff to be suffering from depression and anxiety. In his notes, Dr. Emmons did not

mention plaintiff's back and neck problems because he and plaintiff "focus[ed] that day on his anxiety and depression." Following this visit on September 16, 1993, plaintiff did not see Dr. Emmons again regarding neck and back problems until September 25, 1996, when plaintiff visited him "at his lawyer's request."

Late in the fall of 1993, plaintiff "once again said that he didn't think he was able to do the job." At Olympic's expense, Mr. Patterson then sent plaintiff to see James Strickland, M.D., an orthopedic surgeon, to get "another opinion." Mr. Patterson stated that it "[d]idn't seem like what we were doing with Dr. Emmons was working out too well so [Mr. Patterson] thought we would try an M.D., [and] see if he could discover what the problem was." Dr. Strickland made an independent medical evaluation of plaintiff on November 18. Plaintiff complained of aching and tenderness between his shoulder blades but reported no problems with his hands, elbows, knees, or feet. Dr. Strickland reviewed the x-rays taken in April 1993 and examined plaintiff for approximately twenty minutes, finding "some mild discomfort on palpation in the interscapular area, between the shoulder blades," normal range of motion in his back, normal curvature of the spine, a slight decrease in muscle development on each side of the spine in the mid-thoracic area, and no evidence of any muscle spasm. Dr. Strickland observed no depression and found the "only abnormalities of any significance" to be the pain and tenderness of which plaintiff complained and the decrease in muscle size. He attributed the decrease in muscle size to "a mild sprain to his mid-thoracic spine region" and the fact that plaintiff "had not been on any major rehabilitation program to get his strength back." He noted that the decrease in the size of plaintiff's back muscles caused plaintiff some discomfort "because the back does not have the support it needs." Dr. Strickland found no other objective evidence of injury in his examination of plaintiff and found no evidence of injury to any part of plaintiff's body other than the upper back. He determined that plaintiff "had a good prognosis," that plaintiff's back sprain would resolve completely "if he treated it properly" by engaging in an exercise program for his back muscles, and that plaintiff could return to his job and perform heavy work without restrictions.

After Mr. Patterson received Dr. Strickland's report, Mr. Patterson and plaintiff "talked about the fact that [plaintiff] was getting up in years to be doing the deck hand [job], was having all these problems, [and] maybe it was time that he move up to the wheelhouse" and become a pilot. Mr. Patterson offered to have Olympic pay for river school in Memphis, Tennessee so that plaintiff could pass the exam, get his license, and begin working for Olympic as a pilot. Plaintiff said that he did not want to be a pilot because he had concerns about the "politics" involved. He tried to return to work "one more time" but "once again stated he wasn't able to keep up and do the work."

Mr. Patterson then "came up with the idea of making him a trainer, sending him around to various areas to work with the green or inexperienced deck hands and teach them what he knew." He discussed this idea with plaintiff, who "thought that would be something he would enjoy." In early December 1993, Mr. Patterson sent plaintiff to Cincinnati, where Olympic "had a real need." After arriving, plaintiff met Timothy Delaney, Olympic's interim manager, and Douglas Hannan, the incoming crew manager. Plaintiff made no complaints of pain to Mr. Delaney or Mr. Hannan, who did not observe anything indicating that plaintiff felt pain while he worked in Cincinnati.

Plaintiff worked on five days between December 9 and 13 and stayed in Cincinnati less than a week. According to Mr. Hannan, on each day plaintiff worked with at least one other deck hand and never worked on a boat by himself. Plaintiff claimed that he worked on the boat by himself on two of four nights. His work consisted of "doing the things that a deck hand does" and showing other deck hands "general seamanship," including proper maintenance of the fleet, routine maintenance on the boat, and how to "build tow." On the third or fourth day, Mr. Hannan noticed that the company vehicle that he provided plaintiff to drive to and from work contained a "strong odor of alcohol, a wet

spot in the floor and beer bottle tops." During a crew change on plaintiff's last work night, after learning "what boat he'd be on and who he'd be with and what he would be doing," plaintiff "became very irritated" and stated that he "was not sent up here to splice lines, that he was sent up here to be a deck hand, to train deck hands, not to be splicing lines, that's all he had been doing was splicing lines and that's not what he was sent to do." When plaintiff went to the manager's office, Messrs. Hannan and Delaney noticed "the presence of alcohol and the odor of alcohol in the air" and observed that plaintiff's "speech was slurred" and "movement was slow." Both of them believed that plaintiff was drunk. Mr. Delaney called Mr. Patterson to report "what was going on," including the fact that Mr. Delaney "was sending him back" and "had enough problems down there [and] didn't need this as well." Mr. Patterson then asked to speak to plaintiff and did so. Finally, Mr. Delaney took plaintiff to the bus station and stayed with him until he entered the bus.

When plaintiff returned to St. Louis, Mr. Patterson did not "wash [his] hands of him"; rather, Mr. Patterson "made one more attempt to do something": he referred plaintiff to England and Associates (England) to receive vocational rehabilitation services at Olympic's expense. Plaintiff "didn't want to give up the river" and "wasn't enthusiastic at first" but "agreed to see what they could do for him." In February 1994, he met Tim Kaver, a vocational rehabilitation counselor for England, to help plaintiff "find a new career to be re-employed." At no time did Mr. Kaver, trained in detecting depression, notice any depression in plaintiff. Mr. Kaver reviewed plaintiff's medical records to "know the client's physical restrictions as outlined by the physician so we don't have somebody retrained in an inappropriate career." Mr. Kaver understood that plaintiff "was restricted to light, possibly medium level of work due to at the time [Mr. Kaver] met with him he had complained of a shoulder injury." Olympic allowed England to consider any career requiring formal training in a college or technical school or on-the-job training. If a career required on-the-job training, Olym-

pic would pay half of plaintiff's salary for six months.

After plaintiff met Mr. Kaver, Olympic and Mr. Patterson loaned plaintiff $2800. In connection with the loan from Olympic, plaintiff signed a promissory note for $2000 on March 12, 1994. Mr. Patterson personally loaned plaintiff the remaining $800. Mr. Kaver and plaintiff developed a list of careers which plaintiff "said he would have a possible sincere interest in pursuing," including marine engine repair, hazardous waste removal technology, and eight other careers, all of which "were within his physical abilities." Plaintiff "was most interested" in a career as a hazardous waste technician, a light duty occupation generally paying eight to eighteen dollars per hour with a "full benefit package" including vacation and sick leave. In comparison, plaintiff earned $105 per day on a twelve hour shift at Olympic. Mr. Kaver arranged an "information interview" for plaintiff with an instructor at one of the schools to familiarize plaintiff with the job. After discussing the job with Mr. Kaver, doing his own research on the occupation, and meeting with the instructor, plaintiff "was very confident it was a job he could physically handle." Plaintiff then went to the Environmental Training Center to become certified. Mr. Kaver developed twenty-one "positive leads" with employers who had either "current expected" or periodic openings throughout the year for a hazardous waste technician. He arranged two job interviews for plaintiff, helped prepare a resume for those interviews, and reviewed interviewing techniques with plaintiff. Mr. Kaver "was very confident that [plaintiff] would do an excellent job, had very good communication skills, made good eye contact, spoke well, [and] seemed very confident."

Mr. Kaver scheduled plaintiff's first interview for May 11, 1994 at Haz–Waste, a firm seeking a manager-trainee at ten dollars per hour with a "full benefits package." Plaintiff did not attend the interview, as Mr. Kaver later learned when a Haz–Waste employee called about two hours after the scheduled interview to report that plaintiff did not attend and did not call to reschedule. Surprised, Mr. Kaver unsuccessfully tried to

contact plaintiff, who did not call Mr. Kaver. Mr. Kaver then contacted Mr. Patterson, who reached plaintiff and "had him call" Mr. Kaver on May 25. Plaintiff said that he missed the interview because "he was out of town and his truck broke down."

After speaking to Damien Flaherty, an employee of Envirostaff, Mr. Kaver scheduled a second interview with Envirostaff for May 27, 1994. Plaintiff "was still very interested in pursuing [a job as a hazardous waste technician] as a permanent career." Mr. Kaver stated that Envirostaff sought a hazardous waste technician for twelve dollars an hour "plus benefits." Plaintiff told Mr. Kaver that "he would be there for sure." Nonetheless, two days after the scheduled interview, Mr. Kaver called Envirostaff and learned that plaintiff failed to appear and failed to call. Although Mr. Kaver attempted to call plaintiff, he never talked to plaintiff again. Mr. Kaver concluded that plaintiff "wasn't ready to go back to work [and] wasn't willing to go back to work." In a deposition on February 9, 1996, plaintiff later stated the following with respect to the two interviews he missed: "I blew them all off."

After plaintiff missed the two interviews, Mr. Patterson "finally gave up," telling plaintiff that he "couldn't help him any more." Additionally, Mr. Patterson told plaintiff that he expected him to repay the loan. Plaintiff did not do so. Olympic's payments to plaintiff or on his behalf following the March 1993 accident, not including the loan, totaled $18,591.04, including $4845 in maintenance, $5948.99 in partial wages, $3750.25 in medical bills, $3421.80 to England, and $625 for environmental training.

After May 1994, plaintiff made no efforts to find employment other than attending St. Louis Community College to take courses related to the "mail order business," which business he did not enter. Plaintiff stated that "getting the kids to school, taking care of the house, fishing and drinking beer ... about sum[med] up [his] life" thereafter.

Plaintiff filed his petition for damages on November 23, 1994, a first amended petition on February 8, 1995, and a second amended petition on June 6, 1995. Plaintiff alleged that he "was caused to be injured when the

M/V Mary Burke collided with the M/V Valley Sunrise causing plaintiff to fall down the wheelhouse stairs," that defendants were negligent and Olympic's vessel, equipment, or crew was unseaworthy, and that as a direct and proximate result plaintiff suffered damages including injuries to his knees, head, neck, back, and elbows, past and future losses of "large sums of money which would otherwise have accrued to him," a loss of earning capacity, past and future pain and suffering, disability and disfigurement, and past and future medical bills.

Defendants filed separate answers in December 1995, denying plaintiff's allegations and raising the affirmative defenses of contributory negligence and failure to mitigate damages. Olympic included with its answer a counterclaim against plaintiff for failing to repay the promissory note despite demand. Olympic sought the amount of the note and, as permitted under the note, a reasonable attorney's fee and interest.

On September 25, 1996, at his attorney's request, plaintiff returned to Dr. Emmons. Plaintiff complained of continuing headaches, difficulty sleeping, and pain in his elbows. Dr. Emmons administered the Prime MD, a screening tool used to diagnose depression, and held the impression that plaintiff "had a major depressive disorder with partial remission" which "had improved, but it had not cleared." Dr. Emmons's examination revealed that plaintiff "had acute muscle spasm and sensitivity throughout the paraspinal muscles of the neck and upper back," "increased tone in the muscles on the left side of the neck," "several trigger points noted throughout the muscles," and tenderness in the elbows "over the olecranon process" with no evidence of bursitis. Dr. Emmons believed that plaintiff "had a chronic posttraumatic cervicothoracic pain, neck and back pain, with secondary stress headaches," depression, a sleep disturbance secondary to the depression, and bilateral elbow pain of uncertain etiology. Treatment included a sleep medication, a three week course of steroids for the inflammatory changes, an anti-depressant of which plaintiff received samples, and "blood work" to look for evidence of "a systemic inflammatory state."

Dr. Emmons stated that the posttraumatic chronic cervical and thoracic pain with the secondary stress headache was "directly related" to "the incident of [plaintiff] having fallen from the stairs when the two boats collided," that plaintiff's neck and back condition was permanent, and that plaintiff has not reached "maximum medical improvement from the injuries that he's sustained." He stated that the major depressive disorder also was "related" to that incident. Additionally, he determined that future medical care would include treatment at a pain clinic, psychiatric care for the depression, physical therapy, and rehabilitation, that plaintiff could "probably not" engage in employment requiring heavy lifting or repetitive bending or stooping, and that plaintiff "would need to have the depression treated adequately" before he could "handle any type of reasonable work, whether it be office work or what have you" because plaintiff's "coping skills as a result of the depression just would not allow him to handle the stress." Dr. Emmons stated that he did not learn whether the antidepressant or steroids helped plaintiff, who "never called for a prescription," never "called to say whether they helped," and "has not been heard from."

On October 22, 1996, at defendants' attorney's request, plaintiff returned to Dr. Strickland. He reviewed the records of Drs. Emmons and Singer and examined plaintiff, who complained of "multiple aches and pains, primarily at the base of his neck," which "were associated with headaches that lasted for one or two days at a time." Plaintiff also complained of "continued mild intermittent aching in his interscapular area" and aching in his lower back, knees, and elbows. Dr. Strickland stated that "it would be very unlikely that all these complaints would be caused by an accident" and that he "did not think these additional complaints were related" to plaintiff's fall in March 1993. Dr. Strickland's examination of plaintiff revealed no significant abnormalities; however, plaintiff's back muscles "were slightly diminished" due to "[l]ack of using them" and plaintiff's apparent failure to follow Dr. Strickland's earlier recommendation to engage in an exercise program to strengthen the upper back. Also, Dr. Strickland "could not be sure that

he didn't have any other … medical condition" such as arthritis; however, he stated that such other medical conditions would have no relationship to plaintiff's fall. Dr. Strickland found a normal range of motion in plaintiff's neck, upper back, low back, shoulders, elbows, and hands, found no muscle spasm, and found no crepitus in plaintiff's neck. Plaintiff performed normally on a straight leg raising test, had normal reflexes in his upper and lower extremities, and tested normally on a neurosensory examination. Dr. Strickland's examination of plaintiff revealed no abnormal, objective findings, other than the diminished back muscles, to support plaintiff's complaints of aching in his upper back and lower back, and revealed no objective findings to support the complaints of aching in the neck, knees, and elbows.

Dr. Strickland found plaintiff "to be quite down" with a "very low" mood, even though plaintiff stated that "he did not think he was depressed." Dr. Strickland stated that many causes exist for depression, including chronic pain, alcohol abuse, and family stress, and that any symptoms occurring along with depression are "going to be magnified dramatically," but that he did not know the cause of plaintiff's depression. His examination revealed nothing that would limit plaintiff's ability to perform heavy labor other than the diminished back muscles and the depression problems. Dr. Strickland found that plaintiff did not need and would not benefit from surgery.

Following Dr. Strickland's examination of plaintiff, Olympic filed an amended answer and counterclaim with leave of court on November 25, 1996, and an amended answer and amended counterclaim on February 18, 1997. In Count I of its amended counterclaim, Olympic restated its claim against plaintiff for failing to repay the promissory note despite demand; in Count II, it stated a claim in restitution for recovery of improperly-paid maintenance and cure; and in Count III, it stated a claim for fraudulent misrepresentation.

In Count II, Olympic alleged that (1) in June 1990, prior to beginning his employment with Olympic, plaintiff completed a

written employment application for a position as a "leadman" or "utility man"; (2) "[d]espite specific questions in the application," plaintiff "denied that he had ever been treated for any back injury," even though plaintiff "sustained back injuries for which he received treatment prior to the time he applied"; (3) Olympic hired plaintiff as a "utility man" in reliance upon plaintiff's representations "regarding an absence of any prior injuries to his back"; (4) Olympic would not have hired plaintiff as a "utility man" if it knew of his prior back injuries; (5) plaintiff alleged that he injured his back while working for Olympic in March 1993; (6) before learning of plaintiff's prior back injuries, Olympic paid his medical bills, maintenance, and partial wages totaling over $15,345 under the maritime doctrine of maintenance and cure; and (7) under applicable general maritime law, plaintiff's "material misrepresentation of his physical condition" entitles Olympic to recover from him all maintenance and cure paid to him or on his behalf. For its remedy Olympic requested damages exceeding $15,345 plus interest.

In Count III, Olympic incorporated the allegations summarized in items (1) through (6) of the previous paragraph and further alleged that (1) plaintiff "fraudulently misrepresented his physical condition by denying that he had prior back injuries," that Olympic rightfully relied upon plaintiff's misrepresentation in deciding to hire him, and that Olympic would not have done so "in the absence of such misrepresentation and reasonable reliance thereon"; (2) plaintiff knew of his prior back injuries and treatment when he completed and signed the application, knew that his denial of such injuries and treatment was false, and intended Olympic to rely on his representations "for the purposes of hiring him"; (3) Olympic did not know of plaintiff's prior back injuries when it hired him; (4) before discovering plaintiff's misrepresentation and concealment of his prior back injuries and after learning of plaintiff's alleged current back injuries, Olympic spent more than $18,591 to pay plaintiff's medical bills, vocational rehabilitation, maintenance, and partial wages "which would not have been incurred or paid but for the said fraudulent misrepresentation and concealment";

and (5) accordingly, plaintiff is liable to Olympic for the amount paid plus interest, "reasonable attorney's fees expended in defending the instant lawsuit," and punitive damages exceeding $50,000.

Plaintiff answered Count I of Olympic's counterclaim by admitting that he issued a promissory note to Olympic in the amount of $2000 and denying the other allegations. He answered Count II by (1) admitting that he sustained a back injury in 1973 from which he "has fully recovered" and that he alleged that he sustained a back injury while working for Olympic in March 1993; (2) stating that he had insufficient knowledge of the amount paid by Olympic to him or on his behalf following the alleged injury in March 1993; and (3) denying the other allegations. The record does not show that plaintiff answered Count III but does include a motion to dismiss Counts II and III.

On July 14, 1997, the day before trial, defendants filed an admission of liability which provided as follows:

COME NOW Defendants and admit liability to Plaintiff for the incident of March 8, 1993 resulting in Plaintiff falling down some of the steps of the Pilot House of the M/V MARY BURKE.

However, Defendants continue to contest all issues of damages, and mitigation thereof, and Defendant Olympic Marine Company continues to maintain its three Counterclaims.

This Confession of Liability obviates the necessity of any evidence concerning the events of March 8, 1993 other than the stipulation that Plaintiff fell down some of the steps of the Pilot House of the M/V MARY BURKE and is claiming damages as a result thereof.

Trial began on July 15, 1997. Plaintiff read the deposition of Drs. Emmons and Singer, presented the testimony of Mr. Patterson, wife, and plaintiff, and played the videotaped deposition of Dr. Strickland. These witnesses' testimony included the facts already summarized. Additionally, on cross-examination, (1) plaintiff acknowledged that "[o]ver the years before March 8th of 1993" he "strained muscles in [his] back on various

occasions," causing him to be "off work"; (2) after his attorney unsuccessfully objected on the basis of relevance, plaintiff admitted that he once "hurt [his] shoulder" while working on the river; (3) plaintiff acknowledged that in his deposition of February 9, 1996, he stated that he "still [has] pain in [his] right shoulder"; (4) plaintiff admitted that he "had a history of headaches going back to the early eighties at least"; (5) after his attorney unsuccessfully objected on the basis of relevance, plaintiff admitted that he fractured his skull at the age of five; (6) before his attorney made an untimely objection on the basis of relevance, plaintiff acknowledged that he "[was] hospitalized for headaches in 1972 when [he was] beaten about the head"; (7) plaintiff admitted that, "at least in the early 1980's," his headaches "were so bad that [he was] hospitalized"; and (8) plaintiff acknowledged that Dr. Emmons treated him for headaches in 1991, that he has suffered headaches as often as two to three times per month, that his headaches "can last as long as a month," and that his current headaches virtually incapacitate him, "bring [him] down," and "are as severe as over the last number of years."

Also on cross-examination, (9) plaintiff admitted that he "missed work over the years because of alcohol abuse," that he "[went] through alcohol rehabilitation on two separate occasions," most recently in 1986, and that he was convicted of driving while under the influence of alcohol in 1986; (10) after his attorney unsuccessfully objected on the basis of relevance, plaintiff acknowledged that in June 1974, while working on the R.W. Nay, he "slipped on ice, fell overboard and as [he was] falling overboard [his] back smacked against the steel edge of the barge and [he] went into the water," that he had severe pain in his lower back and left leg and muscle spasm in his back, that he was placed in traction and hospitalized for approximately ten days, and that he received a final diagnosis of "low back strain"; (11) plaintiff admitted that Dr. Singer also diagnosed "low back strain" and that he was not hospitalized after his fall down the steps in March 1993; (12) plaintiff acknowledged that when he signed Olympic's employment application he knew that Olympic would use the health informa-tion therein to determine his fitness to serve as a mate, that his answer to the question, "Have you ever been treated for any back injury, neck injury or any other injury or disease?" was not true, and that, in answering the question, "Do you have any physical, mental or medical impairment or disability that would limit your job performance for the position for which you [are] applying?" he answered in the negative, not disclosing the fact that he periodically suffered "cluster headaches that would put [him] down for about a month at a time"; and (13) after his attorney unsuccessfully objected on the basis of relevance, plaintiff admitted that in 1994 he returned to see Dr. Emmons several times for his "recurrent headaches."

Regarding plaintiff's headaches, Dr. Emmons stated that people suffering from cluster headaches "sometimes become suicidal because of the severity of their headache pain," that cluster headaches can cause one to have somatic dysfunctions, including problems in the neck and upper back, as well as depression, and that plaintiff's cluster headaches in 1991 and 1994 caused somatic dysfunctions.

Near the end of plaintiff's case, the bailiff advised the trial court that during a recess a juror stated that "he recognized someone in the public section of the courtroom as a patron of his bar." The trial court recalled that two to four men sat in the public section of the courtroom, one of whom wore a suit. The man wearing a suit "had occasion to be in [the juror's] bar." Plaintiff's attorney "requested the opportunity to make a record" and moved to remove the juror from service, citing "grave concerns on [his] part that there could be an establishment made that this gentleman is an employee of [defendants' law firm] and that could have a very serious and direct effect on this case." The trial court called the juror to testify under oath and asked him questions regarding his knowledge of the man wearing a suit. The juror testified that he did not know the man's name or occupation. When asked, "[I]s there anything about the fact that you may have served him while he was a patron in your bar that would prevent you from being – continuing to be a fair and impartial

juror?" the juror responded, "No, there's not" and added, "If he is here to offer testimony of his own that may sway me in some way. If he's here simply to read a deposition it won't matter." The trial court then allowed the attorneys to inquire. When plaintiff's attorney asked, "Regardless of who this gentleman is you can give Mr. Yeager a fair trial?" the juror answered, "Yes." The trial court overruled plaintiff's motion to excuse the juror. The man wearing a suit never testified or read a deposition at trial.

Defendants presented the testimony of Messrs. Delaney, Hannan, Kaver, Flaherty, and Patterson. These witnesses' testimony included the facts already summarized. Defendants also read a portion of Dr. Emmons's deposition, highlighting the fact that on July 15, 1991, he found that plaintiff "had multiple cervical and somatic dysfunctions." Finally, defendants read portions of plaintiff's medical records, which included facts already summarized.

On July 18, 1997, the trial court submitted plaintiff's claim for damages and Counts I, II, and III of defendant's counterclaim to the jury. The instruction package included the following three instructions regarding plaintiff's claim:

## INSTRUCTION NO. 8

Your verdict must be for defendants unless you believe:

The fall in evidence resulted in whole or in part in injury to plaintiff.

## INSTRUCTION NO. 9

You must find that plaintiff failed to mitigate damages if you believe:

First, plaintiff failed to accept job opportunities presented to him or failed to make reasonable efforts to obtain employment or failed to keep a job as trainer of deckhands by reason of intoxication or failed to follow through with prescribed physical therapy treatment, and

Second, plaintiff, in one or more of the respects submitted in Paragraph First, thereby failed to use ordinary care, and

Third, plaintiff thereby sustained damage which would not have occurred otherwise.

\* \* \*

## INSTRUCTION NO. 10

■ If you find in favor of plaintiff, then you must award plaintiff such sum as you believe will fairly and justly compensate plaintiff for any damages you believe plaintiff sustained and is reasonably certain to sustain in the future as a result of the occurrence mentioned in the evidence. Any award of future pecuniary damages must be included at present value. Any award you make is not subject to income tax. If you find that plaintiff failed to mitigate damages as submitted in Instruction Number [9], in determining plaintiff's total damages you must not include those damages which would not have occurred without such failure.

The jury returned verdicts in favor of defendant on plaintiff's claim and on Count I of defendant's counterclaim, and in favor of plaintiff on Counts II and III of defendant's counterclaim.

On August 14, 1997, plaintiff filed a motion for new trial, arguing that (1) the jury's verdict "[was] patently against the manifest weight of the evidence" in that "the only issue to be decided" regarding his claim concerned "whether or not plaintiff sustained injury and the specific damages occasioned thereby" and Drs. Singer, Emmons, and Strickland all indicated that plaintiff sustained an injury; (2) the trial court erred in admitting irrelevant evidence concerning plaintiff's cluster headaches, prior shoulder injury, prior skull fracture, being "beat up" at school at age sixteen, prior alcohol treatment, and general drinking habits; and (3) the trial court erred in allowing a juror to remain on the jury because the juror knew a member of defendants' law firm to be a patron of the juror's bar. The trial court denied plaintiff's motion on October 31, 1997.

In his first point on appeal, plaintiff contends that the trial court erred in denying his motion for new trial because the jury verdict

was patently against the manifest weight of the evidence adduced at trial.

■ Denial of a motion for new trial is not an appealable order; appeal must be taken from the judgment to which the motion was directed. *Hitt v. Martin*, 872 S.W.2d 121, 122 (Mo.App. E.D.1994). Questions as to the weight of the evidence are not subjects of appellate review. It is within the exclusive province of the trial court to determine if a jury's verdict is against the weight of the evidence. An appellate court interferes with a jury verdict only if there is a complete absence of probative facts to support a jury verdict. *Id.* at 122–23.

Our decision in *Voss v. Anderson*, 745 S.W.2d 189 (Mo.App. E.D.1987), is instructive as to the application of the proper standard of review. There, following a jury verdict on their claim for damages from personal injury in a rear-end collision, plaintiffs Linda, Louis, and Jason Voss (collectively Vosses) filed a motion for new trial in which they stated that the jury verdict was against the weight of the evidence. The trial court denied their motion. On appeal, Vosses contended that they had offered "extensive, uncontroverted evidence of damages." *Id.* at 189, 192.

At trial, Vosses presented the expert testimony of four medical doctors, including one neurologist, all of whom testified by deposition that Linda's injuries "were triggered by the car accident." The defendant called no expert witnesses to challenge the medical evidence presented by Vosses. *Id.* at 190–91.

In considering Vosses' appeal, we observed, "It is only when there is a complete absence of probative fact to support a verdict that an appellate court will interfere." Applying this standard of review, we noted that although Vosses' four medical experts testified that the collision caused injury, the jury was free to reject their opinions. Furthermore, we stated that the jury might have found incredible the medical experts' opinions that the otherwise relatively minor accident could trigger the extensive damages claimed by Linda. Additionally, we noted that the jury was free to believe, as defendant's questioning suggested, that some other cause other than the automobile accident

caused Linda's injury. Finding no error, we affirmed the judgment. *Id.* at 192–93.

■ Here, although three medical experts testified that the collision caused some injury to plaintiff, the jury was free to reject their opinions. In particular, the jury may have rejected Dr. Emmons's opinion that the 1993 accident caused the extensive damages claimed by plaintiff, and was free to believe, as defendants' questioning suggested, that some other cause or other incidents caused his alleged damages. The testimony of defendants' witnesses plus portions of plaintiff's evidence that supports defendants are probative evidence showing a lack of a causal link between the 1993 accident and plaintiff's alleged damages. Thus, a jury reasonably could conclude that plaintiff's fall as a result of the collision between the M/V Mary Burke and the M/V Valley Sunrise did not cause the damages claimed by plaintiff. Point denied.

In his second point on appeal, plaintiff argues that the trial court erred in admitting evidence of plaintiff's cluster headaches, prior right shoulder injury, prior skull fracture, being "beaten up" at age sixteen, prior pulled muscle, prior alcohol treatment, and general drinking habits because such evidence was irrelevant, immaterial, and lacked competence.

■ We decline to review plaintiff's argument regarding the trial court's admission of evidence that plaintiff had minimal osteoarthritis because plaintiff did not raise this issue in his point relied on. *See Steward v. Goetz*, 945 S.W.2d 520, 528 (Mo.App. E.D. 1997). Furthermore, we note that plaintiff did not object to the admission of evidence concerning a prior pulled muscle and did not raise this issue in his motion for new trial. It is an elementary principle of law that matters complained of on appeal must be preserved for review by objection. *Drury v. Missouri Pacific R.R. Co.*, 905 S.W.2d 138, 148 (Mo.App. E.D.1995). Moreover, to properly preserve an allegation of error for appeal, a party must raise the allegation in a motion for new trial. *Curt Ogden Equip. Co. v. Murphy Leasing Co.*, 895 S.W.2d 604, 610 (Mo.App. E.D.1995). Additionally, we note that plaintiff offered an untimely objection

concerning the admissibility of evidence of plaintiff's being "beaten up" at age sixteen. To preserve a question of admissibility after objectionable testimony is given, the objecting party must move to strike or withdraw the evidence from the jury's consideration. *State ex rel. Missouri Highway and Transp. Comm'n v. Matula*, 910 S.W.2d 355, 361 (Mo. App. E.D.1995). In the absence of such motion, the question of admissibility is not reviewable. *Id.*

The admission or exclusion of evidence is within the sound discretion of the trial court and we will not reverse a trial court's evidentiary ruling unless there is a substantial or glaring injustice. *Liszewski v. Union Elec. Co.*, 941 S.W.2d 748, 751 (Mo. App. E.D.1997). Furthermore, whether or not evidence is relevant is a matter within the trial court's discretion and its ruling will not be reversed absent an abuse of that discretion. *Id.* The test for relevancy is whether the material offered tends to prove or disprove a fact in issue or corroborates other evidence. *Shop 'N Save Warehouse Foods, Inc. v. Soffer*, 918 S.W.2d 851, 863 (Mo.App. E.D.1996).

Regarding the admission of evidence concerning plaintiff's cluster headaches, plaintiff argues that such evidence "prejudiced [him] from receiving compensation for the tension headaches which were related by Dr. Emmons to be a result of the injury that he sustained which evidence was not contradicted by Dr. Strickland nor Dr. Singer." On the other hand, defendants contend that such evidence was relevant to several issues, including the cause of plaintiff's depression, plaintiff's alleged loss of earning capacity, and the significance of plaintiff's alleged failure to disclose his cluster headaches on Olympic's employment application. At trial, Dr. Emmons stated by deposition that people suffering from cluster headaches "sometimes become suicidal because of the severity of their headache pain," that cluster headaches can cause one to have somatic dysfunctions, including problems in the neck and upper back, as well as depression, and that plaintiff's cluster headaches in 1991 and 1994 caused somatic dysfunctions. Moreover, plaintiff testified that since at least the early

1980's his headaches "were so bad that [he was] hospitalized," that he has suffered headaches as often as two to three times per month, that his headaches "can last as long as a month," that his current headaches virtually incapacitate him, "bring [him] down," and "are as severe as over the last number of years," and that, in completing Olympic's employment application, he failed to disclose the fact that he periodically suffered "cluster headaches that would put [him] down for about a month at a time." Such evidence is relevant to all of the issues cited by defendants, as well as to the cause of plaintiff's neck and back pain. Thus, the trial court did not err in admitting such evidence.

Regarding the admission of evidence concerning plaintiff's prior right shoulder injury, plaintiff argues that such evidence "does not only fail to prove or disprove a material fact in issue but to serve no other purpose other than to prejudice the jury against the Plaintiff." On the other hand, defendants contend that such evidence is relevant to the issue of plaintiff's alleged loss of earning capacity and the significance of plaintiff's alleged failure to disclose his prior shoulder injury on Olympic's employment application. At trial, plaintiff testified that he once hurt his shoulder while working on the river and that he still has pain in his right shoulder. This evidence is relevant in assessing plaintiff's future earning capacity. Furthermore, plaintiff testified that, when asked on Olympic's employment application, "Do you have any physical, mental or medical impairment or disability that would limit your job performance for the position for which you [are] applying?" he answered in the negative. This evidence corroborates Olympic's contention that it would not have hired plaintiff if it knew of his prior injuries, including his prior shoulder injury. Therefore, the trial court did not err in admitting evidence of plaintiff's prior shoulder injury.

Regarding the admission of evidence concerning plaintiff's prior skull fracture, plaintiff contends that such evidence did not have "any bearing on the complaints of pain or problems Plaintiff was having with his back, neck or tension headaches" and that

the evidence prejudiced the jury against him. On the other hand, noting that such evidence arose when defendants were "attempting to establish the genesis of the headaches" and that plaintiff denied any link between his skull fracture and the beginning of his headaches, defendants argue that no prejudice resulted because they asked no further questions regarding plaintiff's fractured skull. In reviewing the record, we find no substantial or glaring injustice resulting from the trial court's admission of this evidence. *See Liszewski*, 941 S.W.2d at 751.

Finally, regarding the admission of evidence concerning plaintiff's prior alcohol treatment and general drinking habits, we note that plaintiff elicited evidence that he "was drinking approximately eight beers per day" from Dr. Emmons while Dr. Emmons testified on direct for plaintiff. Plaintiff thereby "opened the door" regarding his drinking habits. A party who opens up a subject is held either to be estopped from objecting to its further development or to have waived his right to object to further development. *Matula*, 910 S.W.2d at 362. Thus, even if the evidence was inadmissible and subsequent argument was improper, plaintiff cannot complain. *Id.* Furthermore, the record shows that plaintiff failed to object as defendants elicited from him testimony that he "missed work over the years because of alcohol abuse," that he "[went] through alcohol rehabilitation on two separate occasions," most recently in 1986, and that he was convicted of driving while under the influence of alcohol in 1986. Matters complained of on appeal must be preserved for review by objection. *Drury*, 905 S.W.2d at 148. Thus, the trial court did not err in admitting evidence of plaintiff's prior alcohol treatment and general drinking habits. Point denied.

In his third point on appeal, plaintiff contends that the trial court erred in admitting evidence of his low back injury in 1974 because such evidence was admissible only for the limited purpose of showing that plaintiff, as alleged in Olympic Marine Company's counterclaim, misrepresented his medical history, and was irrelevant, immaterial, and lacked competence with respect to the injuries of which plaintiff complained in his case.

We decline to review plaintiff's point because plaintiff did not raise this issue in his motion for new trial. To properly preserve an allegation of error for appeal, a party must raise the allegation in a motion for new trial. *Curt Ogden Equip. Co.*, 895 S.W.2d at 610.

In his fourth and final point on appeal, plaintiff argues that the trial court erred in allowing a juror to remain on the jury because the juror knew a member of defendants' law firm to be a patron of the juror's bar.

The trial court is in the best position to determine whether a juror will be able to effectively discharge his duties. *Lester v. Sayles*, 850 S.W.2d 858, 870 (Mo.banc 1993). The substitution of an alternate juror for a regular juror during trial is a matter entrusted to the discretion of the trial court. *State v. Naucke*, 829 S.W.2d 445, 461 (Mo. banc 1992).

The record shows that the juror in question, testifying under oath, stated that the fact that he may have served the man wearing a suit as a patron would not prevent the juror from continuing to be fair and impartial. Additionally, the juror testified that he did not know the man's name or occupation and that he could give plaintiff a fair trial "[r]egardless of who this gentleman is." The record does not indicate that the man wearing a suit testified, read a deposition, spoke on the record, or participated in the trial. On this set of facts, we find it very difficult to conclude that the trial court abused its discretion in overruling plaintiff's motion to excuse the juror. Point denied.

Judgment affirmed.

KATHIANNE KNAUP CRANE, J. and LAWRENCE E. MOONEY, J., concur.