Benjamin UXA, by and through Margaret UXA, and Margaret Uxa and Charles Uxa, individually, Respondents/Cross–Appellants,

v.

Victor C. MARCONI, Defendant/Cross–Respondent,

and

Dorel Juvenile Group, Inc., Appellant/Cross–Respondent.

No. ED 81192.

Missouri Court of Appeals, Eastern District, Division Two.

Dec. 16, 2003.

Motion for Rehearing and/or Transfer to Supreme Court Denied Feb. 11, 2004.

Application for Transfer Denied March 30, 2004.

Daniel T. Rabbitt, Jr., Steven J. Hughes, Brian D. Kennedy, Rabbitt, Pitzer & Snodgrass, P.C., St. Louis, for Appellant/Cross–Respondent.

Cheryl A. Callis, Kortenhof & Ely, St. Louis, for Defendant/Cross–Respondent.

Thomas J. Magee, Robyn Greifzu Fox, Catherine Vale Jochens, Moser and Marsalek, P.C., St. Louis, for Appellant/Cross–Respondent.

Before GARY M. GAERTNER, SR., P.J., KATHIANNE KNAUP CRANE, J. and PAUL J. SIMON, SR., J.

PER CURIAM.

Appellant, Dorel Juvenile Group, Inc. ("Dorel") appeals from the judgment of the Circuit Court of the City of St. Louis, entered in favor of respondents/cross-appellants, Benjamin Uxa, by and through his parents, Margaret Uxa and Charles Uxa (collectively, "plaintiffs," individually,

"Benjamin," "Margaret," and "Charles"), after the jury returned a verdict in the amount of $10,500,000 for Benjamin and $200,000 [1] for Margaret and Charles. Plaintiffs brought a negligence claim against defendant Victor Marconi ("Marconi") and a products liability claim against Dorel. Plaintiffs cross-appeal from the trial court's denial of their motion for prejudgment interest. We affirm in part and reverse and remand in part.[2]

The evidence presented in this case, in the light most favorable to the verdict, is as follows. On September 27, 1999, Benjamin was properly strapped into his child safety seat, a Cosco [3] High Back Booster, in the back seat of Margaret's automobile. Benjamin was approximately two years and eight months old at this time, he weighed twenty-seven pounds and he was approximately thirty-five inches tall. Margaret was attempting to turn left onto Jamieson Avenue from Devonshire Avenue in the City of St. Louis. Marconi was driving northbound on Jamieson at approximately 44 miles-per-hour ("mph") and collided with the left side of Margaret's automobile. The change in velocity of Margaret's automobile was approximately 20–23 mph, and there was a gravitational force ("g-force") of about 16–20. Marconi was intoxicated and pleaded guilty to two counts of second-degree assault.

Neither Marconi nor Margaret suffered any major injuries. Benjamin was still strapped into his car seat when emergency workers arrived on the scene. The first emergency worker on the scene noticed that Benjamin had vomited, was gurgling and was unresponsive. Benjamin was then transported to St. Louis Children's Hospital, where he was in a coma for the first four days following the collision. He was eventually diagnosed with a laceration of the spleen, a brain injury that included bleeding on and around the brain, traumatic optic neuropathy and a brachial plexus injury.[4] Benjamin remained at St. Louis Children's Hospital for approximately fifty days, and the total cost of his medical treatment was $162,238.98.

Benjamin recovered from his spleen injury without medical intervention. According to plaintiff's experts, his spleen injury was likely to have occurred regardless of what kind of car seat he was using.

As a result of his brain injuries, Benjamin underwent serial casting on his feet to prevent his toes from curling and he received significant physical and occupational therapy. Benjamin also was required to wear a patch over his right eye for two hours a day for approximately one and half years because of the optic neuropathy injury. Dr. Michael Noetzel, a pediatric neurologist at St. Louis Children's Hospital, treated Benjamin's brain injury. Dr. Noetzel testified that Benjamin suffered a "significant traumatic brain injury" that could not have occurred unless Benjamin's head came into contact with an object, in this case the car door. Dr. Noetzel examined Benjamin again in July of 2001. Dr. Noetzel testified he believed Benjamin sustained "limited but definite cognitive problems" resulting in a permanent decrease in intelligence, as well as permanent injuries to his left leg and left arm. Benjamin's

---

1. The trial court later reduced the judgment awarded to Margaret and Charles to $140,000.

2. Plaintiff's motion to dismiss Dorel's appeal is hereby denied.

3. Cosco later became Dorel Juvenile Group, and we therefore will refer to the party as Dorel.

4. The brachial plexus is a network of nerves between the spinal cord and the main nerves in the upper arm.

permanent injuries to his left leg and left arm include weakness, poor control and spasticity.

Dr. Susan MacKinnon, the Chief of Plastic Surgery at Washington University School of Medicine, first examined Benjamin's brachial plexus injury on January 6, 2000. Dr. MacKinnon stated she thought that Benjamin "had a very severe left brachial plexus injury." Dr. MacKinnon was concerned about Benjamin's recovery because she first examined Benjamin several months after the accident, and she did not think he had shown sufficient improvement. Dr. MacKinnon performed surgery on February 7, 2000 to improve Benjamin's brachial plexus. During the surgery, Dr. MacKinnon stimulated Benjamin's nerves in his shoulder and elbow and removed some scarring. The surgery was successful, but Benjamin still has problems moving his left arm.

Plaintiffs purchased Benjamin's car seat, a Cosco High Back Booster, on September 16, 1999. The car seat was designed and marketed for use by children weighing between twenty-two and seventy pounds. The primary purpose of such car seats is to provide protection to children involved in an automobile collision. Plaintiffs argued the car seat they purchased was defective and unreasonably dangerous because it did not provide adequate protection for a child Benjamin's size in a side impact collision. Plaintiff's expert, Louis D'Aulerio ("D'Aulerio"), an engineer, testified the car seat should have had wider wings on the side and padding to protect a child's head. He also testified the size range was too broad for the car seat because smaller children need more protection than larger children do. He concluded the car seat was defective and unreasonably dangerous because it did not provide sufficient protection in the event of a side collision. D'Aulerio stated a car

seat that provided more lateral protection by having wider wings and more padding would be a better alternative design.

D'Aulerio ran some tests at a Canadian test facility to determine the effectiveness of child car seats in a side impact collision. He tested the car seat Benjamin was using, as well as a Fisher–Price Safe Embrace car seat. D'Aulerio concluded that the car seat Benjamin was using provided no protection for a child's head leaving the confines of the car seat, and that a car seat with wider wings and padding, such as the Fisher–Price seat, would have provided much better protection.

Dr. Joseph Burton ("Dr. Burton"), a forensic pathologist, testified the car seat was a substantial factor in causing Benjamin's injuries because the car seat allowed Benjamin's head to hit the car door and stretch his neck which ultimately caused Benjamin's brain and brachial plexus injuries. Dr. Burton testified that Benjamin's injuries either would not have happened or would have been less severe if his head was not allowed to leave the confines of the car seat. He testified that Benjamin's brain injury would have been much less severe if he was in a car seat similar to the Fisher–Price Safe Embrace seat. Dr. Burton also testified Benjamin would have received the injury to his spleen no matter what kind of car seat he was using.

On March 1, 2002, following two weeks of trial, the jury returned a verdict finding Dorel and Marconi jointly and severally liable to plaintiffs in the amount of $10,500,000 for Benjamin and $200,000 (subsequently reduced to $140,000) for Margaret and Charles. Dorel filed motions for a new trial and judgment notwithstanding the verdict, which the trial court denied. Plaintiffs filed a motion for prejudgment interest, which the trial court also denied. Dorel raises nine points on

direct appeal, and plaintiffs raise two points on cross-appeal.

All other relevant facts will be discussed in our disposition of the points on appeal.

In its first point on appeal, Dorel makes three arguments. First, Dorel argues the trial court erred in denying its motion for a directed verdict and motion for judgment notwithstanding the verdict ("JNOV") because plaintiffs failed to prove the claimed defect in the car seat proximately caused Benjamin's injuries. Second, Dorel argues plaintiffs failed to meet the legal requirements of a second collision case. Third, Dorel argues Missouri should adopt the reasonable alternative design test of the Restatement (Third) of Torts.

■ This court reviews the denial of a motion for directed verdict and a motion for JNOV in essentially the same manner. *Burns Nat. Lock v. American Family Mut.*, 61 S.W.3d 262, 271 (Mo.App. E.D. 2001). Before a case may be submitted every fact essential to liability must be predicated on legal and sufficient evidence. *Id.* We view the evidence and inferences therefrom in the light most favorable to the verdict and disregard evidence and inferences therefrom that conflict with the verdict. *Id.* The credibility of witnesses is a determination for the jury. *Id.* We will reverse the verdict of a jury for insufficient evidence only if there is a complete absence of probative fact to support the jury's decision. *Id.* For a trial court to sustain a defendant's motion for directed verdict or a motion for JNOV, the facts in evidence and the reasonable inferences therefrom must be "so strongly against a party that no room is left for reasonable minds to differ." *Burns*, 61 S.W.3d at 271.

■ In a strict tort liability case, arising from a design defect, the primary question "is whether the product—because of the way it is designed—creates an un-reasonable risk of danger to the consumer or user when put to normal use." *Nesselrode v. Executive Beechcraft, Inc.*, 707 S.W.2d 371, 375 (Mo.banc 1986). The plaintiff, in a design defect case, must show that the product is defective because it is unreasonably dangerous, and the defect caused his injuries. *Id.* at 375–76. In Missouri, the design of a product is defective when a preponderance of the evidence shows that the design renders the product unreasonably dangerous. *Id.* at 377. The concept of unreasonably dangerous is an ultimate issue presented to the jury without further definition. *Id.* at 378. "The jury gives this concept content by applying their collective intelligence and experience to the broad evidentiary spectrum of facts and circumstances presented by the parties." *Id.*

■ In this case, there was sufficient evidence for a reasonable jury to determine that the Dorel car seat was unreasonably dangerous, and therefore defective. Plaintiff's theory was that the Dorel car seat was defective and unreasonably dangerous because it provided no side impact protection, and it should have had padded deep wings that would limit the head excursion of a child the size of Benjamin.

D'Aulerio testified that the car seat, which was sold for children between twenty-two and seventy pounds, was far too broad of a size range. He did testing in Canada to show forces on a child in a side impact collision, using a change in velocity and g-forces similar to the accident in which Benjamin was injured. D'Aulerio's tests showed that the Dorel car seat provided almost no protection to a child's head from leaving the confines of the car seat. He testified that the car seat should have had wider wings and more padding to protect the child's head in side impact collisions.

Dr. Burton testified that the design of the car seat was a substantial factor in producing Benjamin's injuries as its design allowed his head to come into contact with the intruding car door. Dr. Burton testified that Benjamin's head hitting the car door caused his brain injury. Dr. Burton further testified that if Benjamin were in a seat similar to the Fisher–Price Safe Embrace seat with wider wings, his head would not have stretched as much and that it was probable that he would not have sustained the injury to his brachial plexus.

Further, James Kain, the designer of the car seat at issue in this case, testified that a well-designed child car seat would limit head excursion in all directions in order to prevent a child's head from striking an object on the interior of the car. Kain also testified that the only design problem for having deep wings was that a larger child would feel confined and would not be able to see out.

Dorel argues the evidence showed that wider wings and more padding would have made no difference in this accident, and therefore plaintiffs failed to show that the car seat was unreasonably dangerous. Dorel relies on the testing it did at Veridian in September of 2001, which were similar to the tests D'Aulerio conducted in Canada. Dorel argues that after viewing the tapes of the Veridian testing, and after reviewing the results of the tests from Canada, D'Aulerio admitted on cross-examination that a child's head was likely to leave the confines of a car seat even if the car seat did have wider wings. Dorel also claims that Dr. Burton admitted that even if Benjamin was seated in the Fisher–Price car seat, there was still potential for a brain injury and that Benjamin's head may not have stayed within the confines of the Fisher–Price seat. Therefore, Dorel argues there was no evidence to show that

wider wings and more padding would have made a difference in this case.

However, our inquiry at this stage is whether the car seat was defective because it was unreasonably dangerous. Dorel argues that its car seat was not defective and unreasonably dangerous because the test results it conducted at Veridian and the tests D'Aulerio conducted in Canada showed that the results of their car seat were the same as the results of the Fisher–Price car seat. First, we note that the evidence does not support this contention. Second, we do not need to determine whether the Fisher–Price car seat was defective, but rather only if Dorel's car seat was defective. As outlined above, there was substantial evidence presented to show that the Dorel car seat was defective and unreasonably dangerous because it did not protect the head of a child the size of Benjamin in a side impact collision.

Dorel next argues that plaintiffs did not make a submissible case under the second collision doctrine.

The second collision doctrine "is the legal concept which imposes liability based on the construction or design of a product which causes enhanced or greater injuries in the course of or following an initial accident or collision brought about by some independent cause." *Bass v. General Motors Corp.*, 150 F.3d 842, 846 (8ᵗʰ Cir.1998) *quoting Polk v. Ford Motor Co.*, 529 F.2d 259, 264 (8ᵗʰ Cir.1976) (en banc). The elements the plaintiff must prove in a second collision case are the same as those elements the plaintiff must prove in a strict products liability case. *Cryts v. Ford Motor Co.*, 571 S.W.2d 683, 688 (Mo.App.St.L.Dist.1978), *McDowell v. Kawasaki Motors Corp. USA*, 799 S.W.2d 854, 865 (Mo.App. W.D.1990).

In this case, the second collision doctrine is applicable because the defec-

tive design of the car seat caused enhanced injuries to Benjamin after the initial vehicle collision. As discussed above, there was sufficient evidence for the jury to determine that the car seat was defective, and that the defective car seat was a substantial factor in causing Benjamin's injuries. Therefore, plaintiff made a submissible case under the second collision doctrine.

Dorel's final argument in its first point on appeal is that we should adopt the reasonable alternative design test of the Restatement (Third) of Torts. However, our Supreme Court has refused to adopt the Restatement (Third), and likewise, we refuse to adopt it in this case. *See Rodriguez v. Suzuki Motor Corp.*, 996 S.W.2d 47, 65 (Mo.banc 1999), *Newman v. Ford Motor Co.*, 975 S.W.2d 147, 152–54 (Mo. banc 1998).

In its second point on appeal, Dorel argues the trial court erred in denying its motion for new trial because the verdict was against the greater weight of the evidence.

■■■ We review the denial of a motion for new trial to determine whether there was substantial evidence to support the verdict. *Miller v. Gillespie*, 853 S.W.2d 342, 343–44 (Mo.App. E.D.1993). We review the evidence in the light most favorable to the jury's verdict, and we will not overturn the verdict unless there is a complete lack of probative facts to support it. *Id.* at 344.

As discussed above, we find there was sufficient evidence to support the jury's verdict. Point denied.

In its third point on appeal, Dorel argues the trial court erred in excluding its evidence that the car seat in question complied with the Federal Motor Vehicle Safety Standard 213 ("FMVSS 213").

■■■ Issues concerning either the admission or exclusion of evidence are placed within the sound discretion of the trial court. *Yaeger v. Olympic Marine Co.*, 983 S.W.2d 173, 186 (Mo.App. E.D. 1998). We will affirm the trial court's evidentiary ruling unless there is a substantial or glaring injustice. *Id.* The trial court has discretion to determine whether or not evidence is relevant, and we will not reverse its ruling absent an abuse of that discretion. *Id.* To determine relevancy, the question is whether the material offered tends to prove or disprove a fact in issue or corroborates other evidence. *Id.*

The purpose of FMVSS 213 is "to reduce the number of children killed or injured in motor vehicle crashes and in aircraft." 49 C.F.R. Section 571.213.S2. The regulation provides safety standards for items such as child car seats, booster seats and other child restraint systems. *Id.* at Section 571.213.S4. The regulation requires crash tests to determine if a product meets the safety requirements. *Id.* However, the regulation requires "frontal barrier impact simulations," not side impact simulations. *Id.* at Section 571.213.-S6.1.1(b).

■■■ The crash in this case was a side impact collision. There is no regulation requiring side impact testing. Dorel attempted to present evidence that the car seat complied with FMVSS 213, and was therefore not defective and unreasonably dangerous. However, as FMVSS 213 does not require side impact testing, the regulation is not relevant to the issue of whether the car seat was defective and unreasonably dangerous in a side impact collision. Dorel further argues that FMVSS 213 is relevant because it shows an absence of regulation for side impact collisions. We fail to see how the lack of a federal regulation is probative of whether the car seat was defective and unreasonably dangerous.

Therefore, we find the trial court did not abuse its sound discretion in excluding Dorel's evidence concerning FMVSS 213 and no substantial or glaring injustice resulted from the exclusion of this evidence.[5]

Missouri has not addressed the specific issue of whether compliance with FMVSS is admissible as evidence of whether a defect existed in a product. Dorel cites numerous cases, arguing that such evidence should be admissible. However, because we find FMVSS 213 not relevant for this side impact collision, and the facts before us do not involve a front impact collision, we will not address whether such evidence would be admissible in a front impact collision. Point denied.

In its fourth point on appeal, Dorel argues the trial court erred in excluding evidence on cross-examination of Charles Uxa concerning the type of child car seat that the Uxa's used after the collision.

On its cross-examination of Charles, Dorel asked if the car seats the Uxa's currently used for Benjamin looked similar to the car seat at issue in this case. Plaintiff objected, stating the question was irrelevant, and the court sustained the objection. Dorel explained, after the attorneys approached the bench, that it wanted to show that plaintiffs purchased two car seats after the collision that are both nearly identical to the car seat used when Benjamin was injured. Dorel argues the similarity in car seats is relevant because it shows that plaintiffs did not think the Dorel car seat was defective and unreasonably dangerous, even after they filed suit. Dorel argues that plaintiffs would not have purchased such similar car seats if they believed the car seat was defective and unreasonably dangerous.

█ It was proper for the trial court to exclude the evidence of what kind of car seat Charles and Margaret purchased for Benjamin following the collision because this evidence was not relevant as to whether the Dorel car seat was defective and unreasonably dangerous. At the time of trial, Benjamin was three years older, and nearly twice the size he was at the time of the collision. Plaintiff's claim was that the car seat was defective and unreasonably dangerous for a child the size that Benjamin was at the time of the collision. There is no relevant connection between the car seats used by the Uxas at the time of trial and whether the Dorel car seat was defective. The trial court did not abuse its discretion.

Further, Margaret testified as to the car seats they used for Benjamin following the collision. Therefore, the information that Dorel sought to introduce was later admitted. Point denied.

In its fifth point on appeal, Dorel argues the trial court erred in excluding evidence that all of the high back booster seats on the market in 1999 and at the time of trial were virtually identical to the Dorel car seat at issue in this case.

█ Dorel attempted to introduce this evidence through the direct examination of Kain, the designer of the car seat. The trial court excluded and limited Kain's testimony concerning the other high back booster seats on the market. First, we note that such state of the art testimony is not relevant in a strict liability case based on design defect. *Cryts*, 571 S.W.2d at 689. Second, the exclusion of evidence that is merely additional evidence of the same kind bearing upon the same point will not be considered prejudicial error upon appeal. *Sampson v. Missouri Pacif-*

---

5. Plaintiffs argue that Dorel's offer of proof was not sufficient to preserve this issue for appeal. However, we find that Dorel's offer of proof was sufficient.

*ic R. Co.*, 560 S.W.2d 573, 590 (Mo.banc 1978). In this case, evidence about the other kinds of booster seats did come into evidence through other testimony by Kain, by testimony of D'Aulerio, and by testimony of the Vice President of Dorel, Richard Glover. Point denied.

In its sixth point on appeal, Dorel argues the trial court erred in giving the verdict directing instruction, as well as giving a combined damages instruction, allowing the jury to assess damages against Marconi and Dorel on one form. Plaintiffs argue that we should dismiss this point because Dorel failed to comply with Rule 84.04(d).[6] We note that Dorel's point on appeal did combine several arguments into one point, but we find that it was sufficient for review.

■■■■ Whether or not a jury was correctly instructed is a matter of law. *Hosto v. Union Elec. Co.*, 51 S.W.3d 133, 142 (Mo.App. E.D.2001). When a Missouri Approved Instruction is applicable, its use is mandatory. *Id.*, Rule 70.02(b). To be charged to the jury, an issue submitted in an instruction "must be supported by substantial evidence from which the jury reasonably could find such issue." *Egelhoff v. Holt*, 875 S.W.2d 543, 548 (Mo.banc 1994) *quoting Vandergriff v. Missouri Pacific R.R.*, 769 S.W.2d 99, 104 (Mo.banc 1989). When reviewing the propriety of an instruction, we view the evidence in the light most favorable to submission of the instruction. *Id.* It is proper to give an instruction upon any theory that is supported by the evidence. *Id.*

In this case, instruction number eight, the verdict directing instruction stated:

Your verdict must be for plaintiff [Benjamin] on his claim against [Dorel] if you believe:

First, [Dorel] sold the child car seat in the course of [Dorel's] business, and

Second, the child car seat was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use, and

Third, the child car seat was used in a manner reasonably anticipated, and

Fourth, such defective condition either directly caused damage to [Benjamin] or combined with the acts of defendant Marconi to directly cause damage to [Benjamin].

The first three paragraphs directly follow MAI 25.04, and the fourth paragraph is patterned after MAI 19.01, the "Verdict Directing Modification—Multiple Causes of Damage" instruction. MAI 19.01 provides that when a case involves two or more causes of damage the plaintiff may elect to substitute the final paragraph from one of two choices, the second of which was used in this case. MAI 19.01. It is proper to modify MAI 25.04 with MAI 19.01. *Menschik v. Mid–America Pipeline Co.*, 812 S.W.2d 861, 866 (Mo.App. W.D.1991). Therefore, the trial court did not err in modifying the fourth paragraph of MAI 25.04 with MAI 19.01.

Dorel next argues the trial court erred in giving a combined damage instruction, which allowed the jury to assess damages against Dorel and Marconi on one form. Dorel argues that the instructions should not have instructed the jury to find Dorel liable for all of Benjamin's injuries because there was evidence that the alleged defect was not a substantial factor in causing his injuries.

■■■ In second collision cases, if the jury finds that the product was a substantial factor in producing an indivisible injury to the plaintiff, the defendant manufacturer is to be held jointly and severally

**6.** All rule references are to Missouri Court Rules (2003) unless otherwise indicated.

liable as a concurrent tortfeasor. *Richardson v. Volkswagenwerk, A.G.,* 552 F.Supp. 73, 83 (W.D.Mo.1982). An injury is indivisible when at least two causes combine to produce one injury that is not capable of a reasonable division and each cause is a substantial factor in bringing about the harm. *McDowell,* 799 S.W.2d at 861–62.

Dorel argues that it was not proper to hold it jointly and severally liable with Marconi because Benjamin's injuries were divisible and the jury could have apportioned the injuries between the two defendants. Dorel argues that Benjamin suffered three separate, distinct injuries: 1) damage to his spleen; 2) his brachial plexus injury; and 3) his brain injury. Dorel concludes that the evidence was sufficient to apportion the separate injuries to the separate causes of either the direct collision with Marconi or any defect in the car seats. We disagree.

■ The evidence showed that Benjamin's brain and brachial plexus injuries were indivisible.[7] Dr. Burton testified that the car seat was a substantial factor in producing his brain and brachial plexus injuries, and that Benjamin's injuries would have been greatly reduced if he were in another car seat. Dr. Burton testified that "[i]t's my opinion that [Benjamin's] brain injury will be nonexistent or much less and that his brachial plexus injury will be at least less severe" if not for the defects in the car seat. The evidence does not support Dorel's contention that the injuries were capable of division and apportionment between the two defendants.

The evidence in this case showed that Benjamin suffered multiple injuries caused by the acts of Marconi in conjunction with the defects in the car seat. Further, as discussed in Point I above, the defective car seat was a substantial factor in causing Benjamin's injuries. His injuries were indivisible because a reasonable division was not possible. Therefore, the trial court did not err in submitting a combined damage instruction, holding Dorel and Marconi jointly and severally liable. Point denied.

Dorel argues in its seventh point on appeal that the trial court erred in giving jury instruction number eleven, the withdrawal instruction.

■ The trial court has discretion to determine whether a withdrawal instruction should be given or not. *Shady Valley Park & Pool, Inc. v. Weber, Inc.,* 913 S.W.2d 28, 36 (Mo.App. E.D.1995). We review for abuse of discretion, which "occurs when the trial court's decision is clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Id.* Withdrawal instructions patterned on MAI 34.02 are intended to clarify what the jury is to consider in assessing damages. MAI 34.02 [1978 Revision], Committee Comment (1979 New).

The withdrawal instruction in this case, based on MAI 34.02, stated: "[t]he evidence of plaintiff's damages for injury to [Benjamin's] spleen is withdrawn from the case and you are not to consider such evidence in arriving at your verdict."

Dorel argues the trial court abused its discretion in giving the withdrawal instruction because the cause of the spleen injury was a relevant issue in the case. We disagree.

7. The injury to Benjamin's spleen was withdrawn, as discussed under the next point on appeal.

█ The evidence at trial, specifically the testimony of plaintiff's expert Dr. Burton, showed that the injury to Benjamin's spleen was not caused by any defects in the car seat. The evidence showed that Benjamin would have sustained the injury to his spleen no matter what car seat he was using. Therefore, it was proper for the trial court to clarify that the jury was not to consider the evidence of damages for Benjamin's spleen injury. The use of a withdrawal instruction was the correct method for the trial court to clarify for the jury what evidence they were to consider. Point denied.

In its eighth point on appeal, Dorel argues the trial court erred in denying its motion for new trial because of juror nondisclosure. Specifically, Dorel argues that two jurors who signed the verdict for the plaintiffs had both pleaded guilty to a felony, and the jurors did not disclose this fact during voir dire. Dorel requests that we find that the verdict is a nullity and void as a matter of law, or in the alternative, Dorel requests a new trial based on the nondisclosure by the jurors.

█ A person convicted of a felony is "forever disqualified from serving as a juror." Section 561.026(3) RSMo 2000.[8] A person is not "convicted" when collateral punitive consequences attach unless it is shown that a judgment has been pronounced upon the verdict. *Yale v. City of Independence*, 846 S.W.2d 193, 194 (Mo. banc 1993). Further, a suspended imposition of sentence ("SIS") is not a final judgment. *Id.* The term "conviction," by itself, "does not include a plea or finding of guilt where imposition of sentence is suspended and that such a disposition is not one to which collateral consequences attach." *Id.* at 195.

In this case, after the jury rendered its verdict, Dorel made a motion for new trial, claiming that two jurors had each pleaded guilty to a felony. The Legal File does not contain the documents that Dorel relied on to show that the jurors had pleaded guilty, but there is sufficient evidence in the transcript to discern what transpired below.

Dorel received two certified files, one from the City of St. Louis and one from St. Louis County, concerning two people with the same names as two of the jurors. The files showed that two people had each pleaded guilty to stealing from a corporation, and that both people had received a SIS. The trial court refused to make a finding that the two people in the certified files were in fact on the jury in this case. Following oral argument on Dorel's motion for new trial, Dorel returned the original certified copies to their respective jurisdictions.

█ Assuming arguendo that the two people in the original certified files that received SISs were the same people as those on the jury, we disagree with Dorel's argument that the jurors were ineligible to serve on a jury because they both received a SIS. The right to serve on a jury is not affected by a SIS because it is not a disposition to which such a collateral consequence can attach because there is no final judgment. Therefore, a SIS is not a "conviction" for purposes of Section 561.026(3).

Dorel argues that the Supreme Court has acknowledged certain circumstances in which collateral consequences do attach when a SIS is imposed, and that the right to serve on a jury should be similarly affected by such a sentence. In *Yale,* the Supreme Court did recognize the following exceptions for collateral consequences for SISs: 1) Section 558.016.1, defining prior,

---

**8.** All statutory references are to RSMo 2000.

persistent and dangerous conditions, 2) Section 491.050, providing for the use of a prior conviction for impeachment of a witness, and 3) Section 577.051.1, providing that a SIS is a "final disposition" in alcohol and drug-related driving offenses. *Yale.* 846 S.W.2d at 195. However, "[t]hese statutes apply only in certain specific instances. Had the legislature intended to define 'conviction' to include the disposition of suspended imposition of sentence in *all* cases, it would have done so." *Id.* (Emphasis in the original).

In this case, like in *Yale,* the word "conviction" does not include a disposition of SIS. The statutes, particularly Section 561.026(3), do not provide for such a specific exception. Therefore, we refuse to create an exception to the general rule that a "conviction" does not include a SIS.

 Nor do we find that the jurors failed to disclose their SISs during voir dire. The jurors were not asked during voir dire if anyone had ever received a SIS. Dorel's argument is that the panel was asked during voir dire whether they could be fair to a corporation. Dorel argues that "[c]ommon sense would suggest that if an individual is willing to steal from a corporation that individual would possess an inherent bias or unfair attitude towards a defendant corporation."

We find Dorel's argument unpersuasive. There was no nondisclosure as to the SISs because the panel was never asked if anyone had ever received a SIS. Nor do we find that Dorel was prejudiced by the answers given to the question as to whether the panel could be fair to a corporation. Point denied.

In its final point on appeal, Dorel argues the trial court erred in failing to grant remittitur because the verdict was grossly excessive and substantially higher than other awards for similar injuries.

 The trial court is vested with broad discretion in ordering remittitur. *Lopez v. Three Rivers Elec. Co-op., Inc.,* 92 S.W.3d 165, 175 (Mo.App. E.D.2002). We will not overturn a trial court's order on remittitur absent an abuse of discretion so grossly excessive that it shocks the conscience and shows that both the trial judge and the jury abused their discretion. *Id.* To determine whether an award is excessive, we examine a number of factors: 1) present and future loss of income; 2) medical expenses; 3) the plaintiff's age; 4) the nature and extent of the injuries suffered; 5) economic considerations; 6) other awards in comparable cases; and 7) "the superior opportunity for the jury and the trial court to evaluate plaintiff's injuries and other damages." *Othman v. Wal-Mart Stores, Inc.,* 91 S.W.3d 684, 687 (Mo. App. E.D.2002).

 In this case, Benjamin was two years and eight months old when he was injured. Prior to the collision, Benjamin did not experience any serious health problems, and he was achieving age-appropriate milestones. Following the collision, Benjamin was in a coma for four days, he was hospitalized for fifty days, he underwent a major surgery for his brachial plexus injury, he sustained a major brain injury, he had to undergo painful physical therapy, and he had to wear a splint on his left hand and orthotic devices on his feet because of problems associated with the brain injury. He still has limited control of his left leg and suffers permanent weakness in his left leg. As a result, Benjamin will have to undergo physical and occupational therapy for many years in the future. Further, Benjamin suffered a definite permanent reduction in his cognitive abilities.

Therefore, based upon the evidence, and after considering all of the factors for remittitur, we find that the trial court did

not abuse its discretion in refusing to grant remittitur. Point denied.

In their first point on cross-appeal, plaintiffs argue that the trial court erred as a matter of law in denying their motion for prejudgment interest. We agree.

We review the trial court's judgment on the application of a statute under the *de novo* standard, as it is a question of law. *Cole v. Warren County R–III School Dist.*, 23 S.W.3d 756, 760 (Mo.App. E.D.2000).

In tort cases, such as this one, prejudgment interest is permitted under Section 408.040.2, which states:

> In tort actions, if a claimant has made a demand for payment of a claim or an offer of settlement of a claim, to the party, parties or their representatives and the amount of the judgment or order exceeds the demand for payment or offer of settlement, prejudgment interest, at the rate specified in subsection 1 of this section, shall be calculated from a date sixty days after the demand or offer was made, or from the date the demand or offer was rejected without counter offer, whichever is earlier. Any such demand or offer shall be made in writing and sent by certified mail and shall be left open for sixty days unless rejected earlier. Nothing contained herein shall limit the right of a claimant, in actions other than tort actions, to recover prejudgment interest as otherwise provided by law or contract. Section 408.040.2.

Following the trial, plaintiffs filed a motion for prejudgment interest. The trial court denied the motion, because it found that plaintiff's prayer for relief did not sufficiently plead prejudgment interest. In plaintiff's First Amended Petition, in all four counts, plaintiff prayed for judgment "in an amount in excess of $25,000.00 plus costs." There was no specific mention in the petition for prejudgment interest.

However, "[t]he prayer for relief need not include a request for prejudgment interest otherwise properly allowable under subsection 2 of section 408.040, RSMo." Section 509.050.1(2). Further, section 408.040.2 contains no pleading requirement, and therefore an open-ended prayer of relief is sufficient. *Call v. Heard*, 925 S.W.2d 840, 854 (Mo.banc 1996).

Plaintiffs mailed a demand letter to Dorel on August 23, 2000. In that letter, plaintiffs made a demand settlement of all claims against Dorel for $7,500,000. This offer was open for at least sixty days. Following the trial, the jury returned a verdict on Benjamin's claim for $10,500,000 and on Margaret and Charles' claim for $200,000, which was later reduced to $140,000. Therefore, plaintiffs clearly satisfied the requirements of section 408.040.2.

Next, we turn to the issue of whether plaintiff's petition was sufficient for prejudgment interest. We find that it was.

The applicable provision in section 509.050.1(2) was amended in 1993 and has not been addressed by an Appellate Court in Missouri. The wording of the statute expressly states that a party need not include a request for prejudgment interest in their prayer for relief, as long as the requirements of section 408.040.2 are satisfied. As discussed above, plaintiffs did satisfy all of the requirements in section 408.040.2. Further, our Supreme Court stated, without addressing section 509.050.1(2), that section 408.040.2 does not contain a pleading requirement. Therefore, based on the express wording in section 509.050.1(2), in conjunction with *Call*, the trial court erred in not awarding prejudgment interest.

Dorel argues that plaintiffs are essentially asking us to overrule *Call* because the Supreme Court, in that case, held that

an open-ended prayer of relief was sufficient for prejudgment interest. *Call*, 925 S.W.2d at 854. In *Call*, the prayer called for damages "and for such other and further relief as this court deems just and proper under the circumstances." *Id.* The Supreme Court held that such language was sufficient to award prejudgment interest. *Id.* Dorel argues that *Call* did not abolish all pleading requirements for prejudgment interest, only that prejudgment interest need not be pled expressly. We disagree.

As discussed above, based on section 509.050.1(2) and *Call*, there are no pleading requirements for prejudgment interest as long as all the requirements of section 408.040.2 are satisfied. Point granted. Reversed and remanded.

Because we find plaintiff's first point on cross-appeal dispositive, we need not address plaintiff's second point.

Based on the foregoing, the judgment of the trial court is affirmed in part, and reversed and remanded in part.