REISS & GOODNESS ENGINEERS, INC., Plaintiff,

and

Lynnson, Inc., Plaintiff–Appellant,

v.

CITY OF GOODMAN, MO, Defendant–Respondent.

No. SD 29600.

Missouri Court of Appeals, Southern District, Division Two.

Feb. 10, 2010.

---

Peter C. Edwards, Joplin, for appellant.

Duane A. Cooper, Pineville, for respondent.

NANCY STEFFEN RAHMEYER, Judge.

Reiss & Goodness Engineers, Inc. ("Reiss & Goodness"), and Lynnson, Inc. ("Lynnson"), brought a breach of contract action against the City of Goodman, Missouri ("the City"), which filed a counterclaim for breach of contract against Lynnson and Reiss & Goodness. Following a jury trial, the Circuit Court of McDonald County, Missouri, entered judgments against Reiss & Goodness and Lynnson in the amount of $318,669 each, which Lynnson now appeals. We affirm.

The facts viewed in the light most favorable to the verdict[1] are as follows. The City retained Reiss & Goodness as the architect and engineer on a project to replace its dilapidated water distribution system, and awarded a contract to Lynnson to complete the project. As architect and engineer, Reiss & Goodness provided the plans and specifications for the project, which called for the installation of new water lines and accoutrements. According to the plans, Lynnson was to install new main lines, service mains, service lines, meter boxes, fire hydrants, and valves for purging the water system. All lines and mains were to be buried at a minimum depth of thirty-six inches, and the meters were to be a minimum of eighteen inches below the tops of the meter boxes, which kept dirt off the meters and provided an insulating air blanket to protect against freeze damage. Any departures from the plans regarding depth of lines and meters were to be in the form of a written change order. An addendum was executed changing the depth of the meter boxes from thirty-six to twenty-four inches; however, the plans still required a thirty-six inch backfill over the mains and the service lines.

Reiss & Goodness was charged with interpreting the intent of plans and overseeing construction. An inspector from Reiss & Goodness, Maurice Clark, was to monitor construction to ensure that it met the specifications and acceptable engineering practice standards. Under the contract, Lynnson was to be "held strictly to the intent of the contract documents in regard to the quality of materials, workmanship, and execution of the work." From the outset of the project, complaints arose about the quality of workmanship, depths

---

1. On review we view the evidence and any reasonable inferences drawn therefrom in the light most favorable to the verdict, and disregard any contrary facts and inferences. *Sparkman v. Columbia Mut. Ins. Co.,* 271 S.W.3d 619, 623 (Mo.App. S.D.2008).

of the mains, lines and meters, and general cleanup. Throughout the construction period, Lynnson submitted monthly pay estimates describing the work performed and materials used, which were then reviewed and approved by Reiss & Goodness and submitted to the City for payment. Of the seventeen pay estimates, all were approved by Reiss & Goodness, and all were paid with the exception of the final payment of $92,757.83, which the City refused despite Reiss & Goodness's approval and final certification of the project.

Lynnson filed its breach of contract action on October 2, 2006, and the City filed an answer and counterclaim on November 1, 2006, alleging that Lynnson failed to install the water system in accordance with the specifications, failed to install lines and meters to the proper depths, and failed to repair road and yard cuts. At trial, Robert Persons, the president of Lynnson, admitted that the plans called for thirty-six inches of backfill over all lines, that the mains were to connect to the meter setter at a depth of thirty-six inches, that the mains were buried at a depth of twenty-four inches, and that no written field orders regarding depth changes were received. Al Reiss, the president of Reiss & Goodness, also acknowledged that all pipe was to be buried with thirty-six inches of backfill, that meters were to be buried at eighteen inches below grade, that if the meter depths were shallower than eighteen inches it would indicate that the service mains were buried at shallower than thirty-six inches, that no written change orders regarding depth changes were issued, and that Reiss & Goodness's obligations under the contract did not relieve Lynnson of its obligation to perform the work in accordance with the plans.

Tom Conrad, an inspector, gas repairman, and general handyman for Reiss & Goodness, testified that he measured the depths of the main lines throughout the town at three separate locations per city block and that all main lines he measured were at a depth of at least thirty-six inches. Chris Morgan, a heavy equipment operator who was subcontracted by Lynnson to dig trenches in which to lay pipe and who was later retained by the City to dig up some of the lines and determine their depth, testified that Clark monitored his work toward the beginning of the project, but that he was later pushed to lay pipe as quickly as possible, and that upon further examination of the lines and mains, none were buried at the appropriate depth. David Brodie, the City's superintendent, testified that fire hydrants were installed too high, that one hydrant had been installed in the middle of a residential driveway facing the wrong direction, that ninety percent of Lynnson's street cuts had sunk and needed repair, that other driveways required repair, that of five hundred meters installed, four hundred and thirty were installed at less than the contract depth, and that several lines were discovered to be too shallow. In addition to Brodie's testimony, thirty-three photographs were introduced into evidence demonstrating main lines buried at depths varying from fourteen to thirty-two inches.

The City also called Steve Lett, a professional engineer, as an expert witness to testify on the issues of construction, oversight, and damages. Lett testified that, upon review of the work, project plans, photographs, and measurements, the construction had not been done in accordance with the contract documents. Lett also testified regarding damages, the portion of his testimony relevant to this appeal being that concerning the cost of lowering the water mains. Lett was examined outside the presence of the jury, and when asked if he could state to a reasonable degree of engineering certainty that thirty percent of the mains were too shallow, he responded, "[n]o; there may be more than that."

On direct, the City asked Lett whether he believed that the thirty percent figure could be exceeded, to which he answered in the affirmative. When asked if he believed within a reasonable degree of certainty particular in his profession whether the figure was lower than thirty percent, he responded, "[n]o," and went on to agree that in his professional opinion, thirty percent was the least amount of main line that needed to be replaced. Following objections and further examination, the trial court posited a question as to what the absolute minimum would be within a reasonable degree of professional certainty, leading to the following exchange:

> [COUNSEL FOR THE CITY]: Do you have an opinion within a reasonable degree of certainty, particularly in your profession as an engineer, with respect to the minimum amount of ... main lines that need to be replaced?
>
> [LETT]: I believe that the thirty percent that's contained in my preliminary report is the minimum amount that would need to be replaced, and I can say that with a reasonable amount of certainty.

Following that exchange, the trial court overruled the objections and allowed Lett to repeat his testimony in front of the jury. Lett further testified that the thirty percent was a conservative figure. Lett also testified that costs would total: $63,640 for road repairs; $1,376 for driveway repairs; $3,880 for valve installation; $4,850 for lowering fire hydrants; $66,500 for potholing to determine the exact amount of repairs needed; and $323,360 for lowering service lines and meters. The sum of those repairs would be $463,606. Lett estimated that the cost of replacing the main lines was $343,930.50. Following additional testimony not relevant to this appeal,

the case was submitted to the jury, which returned a verdict in favor of the City on Lynnson's claim and in favor of the City on its counterclaim against Lynnson in the amount of $318,669,[2] which Lynnson now appeals.

In the first point relied on, Lynnson alleges that the trial court erred in allowing Lett's testimony regarding damages for the inadequate depth of water mains because he could not testify to a reasonable degree of engineering certainty, and that the trial court also erred in not granting a new trial on this basis. We disagree.

■ Lynnson challenges the admission of Lett's testimony that the City suffered damages of $343,930 for the cost of lowering the main lines, but does not challenge the admission of Lett's testimony regarding damages totaling $463,606 for the cost of road and driveway repairs, valve installation, lowering fire hydrants, potholing, and lowering service lines and meters. The jury ordered Lynnson to pay $318,669, less than the $463,606 that went unchallenged. We need not reach the issue of whether the admission of Lett's testimony was in error, because any such error appears to have been harmless. Point I is denied.

In its second point, Lynnson alleges that the trial court erred in not granting a new trial because the jury's verdict was clearly against the weight of the evidence, in that the evidence showed that all water mains were buried to a depth of thirty-six inches or deeper and that the service lines buried at a shallower depth were accepted as consistent with the plans by Reiss & Goodness, who had authority to change the specifications as the City's agent. We disagree.

**2.** The jury also rendered a verdict in favor of the City against Reiss & Goodness in the amount of $318,669.

When a jury returns a verdict in favor of the party with the burden of proof, we review the denial of a motion for new trial for abuse of discretion. *See Warren Davis Props. V, L.L.C. v. United Fire & Cas. Co.*, 111 S.W.3d 515, 520 (Mo. App. S.D.2003) (stating that proper standard of review for denial of motion for new trial is abuse of discretion where jury verdict found for plaintiff); *Black & Veatch Corp. v. Wellington Syndicate*, 302 S.W.3d 114, 128 (Mo.App. W.D.2009) (stating that where a motion for new trial alleges that the jury verdict is against the weight of the evidence and the moving party had the burden of proof, the trial court's denial of the motion is a conclusive determination that may not be overturned on appeal). "Our review is performed in the light most favorable to the verdict and we do not consider matters such as the weight of the evidence, the credibility of witnesses, or the resolution of conflicting testimony." *Warren Davis Properties V, L.L.C.*, 111 S.W.3d at 520. In making our determination, we consider whether substantial evidence exists to support the verdict. *Id.* at 521. We will not disturb the jury's verdict unless there are no probative facts to support it. *Id.*

Here, probative facts exist to support a finding that the main lines were not all buried to a depth of thirty-six inches. While Tom Conrad testified that all of the main lines he measured were at a depth of at least thirty-six inches, viewing all evidence in the light most favorable to the verdict, we cannot simply ignore the testimony and evidence to the contrary. David Brodie acknowledged that in his deposition he stated that the main lines were all buried at or close to thirty-six inches, but he went on to say that he received additional information following the deposition that suggested that some lines were buried at a depth of less than thirty-six inches. That testimony, combined with the testimony of Chris Morgan and Steve Lett, and the photographs demonstrating that the main lines were buried at a depth of less than thirty-six inches, provided the probative facts necessary to support the jury's finding.

We next consider Lynnson's claim that the evidence showed that the shallower bury depths of the service lines were accepted by Reiss & Goodness as appropriate and proper according to the plans and specifications.[3] According to Lynnson, the evidence shows that Reiss & Goodness instructed Lynnson to install service lines at depths shallower than those called for by the plans in order to connect to existing service lines that were buried at depths ranging from eight to eighteen inches. However, Al Reiss testified that he thought he had told the foreman "what he needed to do to keep those meters down." In addition, that Reiss & Goodness were charged with interpreting the contract documents, and inspecting and approving of construction, simply does not change the fact that Lynnson was obligated to complete the project according to the specifications, and that all changes in line depth were to be authorized by a written field order, which Persons acknowledged in his testimony. Given that the testimony regarding the acceptance of shallower depths is contradictory and that no field orders were issued to change the

---

**3.** The point, as stated in the argument portion of Lynnson's brief, also alleges that the verdict was against the weight of the evidence in that the evidence showed that the City previously decided not to lower certain existing lines so they cannot claim damages for lowering new line used to connect to existing lines. Claims of error first raised in the argument portion of a brief and not in the point relied on are not preserved for review. *Berger v. Huser*, 498 S.W.2d 536, 539 (Mo.1973). Accordingly, we decline to address this addition to the point.

specified depths of the service lines, probative facts exist to support the jury's finding. Accordingly, we find that the trial court acted within its discretion in denying Lynnson's motion for new trial. Point II is denied.

In its third point, Lynnson alleges that the trial court erred in denying Lynnson's motions for directed verdict and for judgment notwithstanding the verdict because the project was completed in accordance with the plans and accepted by Reiss & Goodness, who had actual authority to interpret and deviate from the plans. Again, we disagree.

■■■ We review the denial of a motion for directed verdict and motion for judgment notwithstanding the verdict in the same manner. *Uxa ex rel. Uxa v. Marconi,* 128 S.W.3d 121, 128 (Mo.App. E.D.2003). Both are reviewed to determine whether the party against whom it is sought made a submissible case. *Warren Davis Props. V, L.L.C.,* 111 S.W.3d at 521. To make a submissible case, each element of the claim must be supported by substantial evidence. *Id.* In order to make a submissible case in a breach of contract action, substantial evidence must exist to establish: 1) that a valid contract exists; 2) the rights and obligations of the parties; 3) a breach; and 4) damages. *Id.* Because Lynnson's point only alleges that the project was constructed in accordance with the plans and accepted by the City's agent as such, we need only consider whether substantial evidence exists to support the jury's finding of a breach of the contract.

Lynnson essentially argues that no substantial evidence exists to support the finding of a breach because any deviations from the specifications were approved by Reiss & Goodness, who had the authority to interpret and change the specifications. Again, this argument ignores the fact that changes were to be in the form of a written field order. It also ignores the fact that Reiss & Goodness were also found to have breached the contract with the City. Thus, Lynnson may not shield itself from its breach by Reiss & Goodness's breach.

Lynnson cites *Williams v. Chicago, Santa Fe & Cal. Ry. Co.,* 112 Mo. 463, 20 S.W. 631, 639 (1892), and *Stiers Bros. Constr. Co. v. Moore,* 158 S.W.2d 253, 257 (Mo. App.St.L.D.1942), in support of the proposition that the City designated Reiss & Goodness as the architect and engineer, gave Reiss & Goodness the authority to make decisions regarding the execution of the contract, and was therefore bound by Reiss & Goodness's acceptance and approval of the bury depths differing from those specified in the plans, absent a showing of fraud or such gross mistake as to imply bad faith. While the cited cases state a similar proposition, in neither case were the decisions required to be in writing, making both inapplicable to the instant case. Here, Reiss & Goodness was granted authority to interpret contract documents, and Brodie testified that the bury depth of the service lines was an interpretation issue, but Persons acknowledged that a field order "effecting a change in the work" was required to be in writing, and that he had no written orders changing the specified depth of the service lines. Given that Lynnson had no written authorization to deviate from the plans, evidence that the service lines were buried at depths shallower than those specified in the plans constitutes substantial evidence of a breach. As a result, the City made a submissible case on the breach of contract claim. Point III is denied.

The judgment is affirmed.

SCOTT, C.J., and LYNCH, P.J., concur.